This is an appeal from the order of the court below dismissing the appeal of the plaintiff from the settlement of its claim against the Commonwealth based upon certain assigned accounts covering purchases of liquor by the Pennsylvania Liquor Control Board from Rudolph Shlifer. The procedure followed at the inception of this case was pursuant to the provisions of the Fiscal Code of April 9, 1929, P. L. 343, sections 405, 1003, 1004, 1101, 1102, 1103, 1104; 72 PS 405, et seq. Plaintiff filed a statement of his account with the Auditor General, claiming $30,561.00, with interest from the Commonwealth. An answer was filed by the Liquor Control Board. After testimony was taken the Auditor General and State Treasurer allowed prima facie a claim of $10,924.00 on "assigned orders" and then deducted $3,856.03 as "set-offs and counter-claims" in favor of the Commonwealth and made the net award $7,067.97. A petition for resettlement was filed with the officials above named, and refused. A petition for review was then filed with the Board of Finance and Revenue, and this was refused.
When the claimant filed its appeal in the court below, together with its specifications of objections, it was agreed that the testimony taken before the Auditor General and State Treasurer should be filed in Court of Common Pleas with the same effect as though the testimony had been taken therein. *Page 195 
Rudolph Shlifer was in the business of selling liquors to the Pennsylvania Liquor Control Board. This action arises from a series of transactions between Shlifer, the Board and the Bank. Shlifer upon receiving purchase orders from the Board would obtain from the Bank a loan of money. As security for the loan he would execute an assignment of the money due him under the orders of the Board, and deliver to the Bank invoices addressed to the Board, in forms provided by the Board, and also invoices on his own forms. He assigned the specific sums called for in the respective orders and he warranted that ". . . said merchandise has been heretofor delivered in accordance with directions of the . . . Board." The Bank mailed these assignments and invoices to the Board, accompanied by a letter which stated, inter alia, "We ask that the same be accepted by the Board and acknowledged to us in order that check, when drawn, will be mailed directly to us." The Chief of Disbursements for the Board acknowledged receipt of the assignments and invoices and stated: "When payment of these invoices is made, checks will be sent directly to your bank."
Shlifer failed to deliver liquor called for in three of these orders and the Board refused to pay the assignee for the merchandise not so delivered. From this fact arises the major part of this litigation. The contention of the Bank is that the Board acquiesced in the warrant of delivery through failure to call attention to the fact of non-delivery, that moneys were advanced in reliance on the assignment and warrants and that the state is now estopped to deny delivery. The Commonwealth takes the position that the Bank knew that the Board was promising to send it only what was due Shlifer and that the Bank stands in no better position than its assignor. The Commonwealth admits that certain sums are due the Bank on assigned orders where delivery was made but claims the right to set off certain sums owed by Shlifer to the Commonwealth. The Commonwealth *Page 196 
admits that it owes Shlifer on these assigned and filled orders $10,924.00 and an additional sum of $95.73 on unassigned orders and it avers that it has set-offs and counter-claims against him in the amount of $3,951.76. The net sum admitted due (and found to be due) is $7,067.97.
The claim made by the plaintiff below is made up of several items. The first item is a claim for $14,481.75. On October 26, 1937, Shlifer applied to the Bank for a loan of $47,695.65 and as security therefor he assigned moneys due on purchase orders issued by the Board, to wit: numbers 42814, 42815, 42816 and 42817. He also left with the Bank (A) "Vendors Standard Invoices", which is a form used by the Board, and (B) invoices on his own form. These assignments contained the warranty as to delivery hereinbefore referred to. The procedure then followed by the Bank and the Board, respectively, was that above stated. The Bank then advanced to Shlifer the sum asked for. The Board paid the Bank the sums covered by the orders numbered 42815-6-7 and $14,481.75 on order numbered 42814, but refused to pay the balance of $14,642.00 claimed under that order because of the non-delivery of liquor represented by that balance. The Bank contends that the Commonwealth is by reason of the Boards failure to notify the Bank of this non-delivery of liquor estopped to assert it in these proceedings.
The first question is therefore: Does this record contain facts which warrant the allowance of the estoppel invoked? Equitable "estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. In this situation, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the *Page 197 
state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements": 31 C.J.S., sec. 59, p. 237; Howe v. Mimm, 105 Pa. Super. 474, 161 A. 603,605.
The following principles must be considered in applying the doctrine of equitable estoppel: ". . . in the absence of expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites.": 31 C.J.S., sec. 69, p. 261. "There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise.": 31 C.J.S., sec. 71, p. 269. "Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake.": 31 C.J.S., sec. 75, 282. "Estoppel cannot be predicated on errors of judgment by person asking its benefit.": Grand Central Public Market v. U.S., D.C. Cal., 22 F. Supp. 119, appeal dismissed, C.C.A., U.S. v. Grand Central Public Market, 98 F.2d 1023.
The facts here present do not measure up to the requirements of an equitable estoppel. The assignment from Shlifer to the Board showed on its face that it was *Page 198 
not the assignment of a debt absolutely due. It expressly recognized the fact that the "merchandise covered by any such invoice" might "in any particular fail to comply with such purchase order" and thereby it implied its possible return to the seller. It also expressly recognized that there might be a "set-off or counterclaim . . . asserted by the Liqour Control Board against payment of any such invoice." The Bank made no specific inquiry of the Board as to whether or not the liquor had been delivered, nor did it in its letter of transmissal of the assignments indicate that it was relying on the Boards "acquiescence" in Shlifer's warranty of delivery. We have heretofore quoted what the Board in its acknowledgment said about "payment of these invoices". An invoice refers primarily to goods sent. The Bank did not ask for shipping receipts ordelivery receipts, which business prudence required that it should do before making the advances to Shlifer. On December 23, 1936 and on subsequent dates, the Board in mailing checks to the Bank covering similar assignments of Shlifer had deducted varying amounts on account of Shlifer's failure to deliver liquor according to the orders. On March 7, 1938 there appeared on an order, when it was brought to the Bank, the following: "Unshipped balance . . . on P. O. 42814 has been cancelled." All these things put the Bank officials on notice that the Board would pay the assignee only the amounts owed foractual deliveries of merchandise and that Shlifer's "warranty" was a matter exclusively between him and the Bank. There is in the record testimony showing that in a later transaction with Shlifer the Bank did require proof of the delivery of the goods covered by his assignment. In Hill et al. v. Epley et al.,31 Pa. 331, 334, this court said: "If . . . the truth be known to both parties, or if they have equal means of knowledge, there can be no estoppel . . . one is not relieved, who had the means of becoming acquainted with the extent of his rights: . . . It should never be forgotten, that there is a wide difference between *Page 199 
silence and encouragement." The case of Strang v. MacArthur,212 Pa. 477, 61 A. 1015, relied by appellant is clearly distinguishable from the instant case, for there the estoppel invoked was based on a letter which the court held was unquestionably "intended as an inducement to the bank to discount the paper" and "a fair construction of the letter shows that the [defendant] firm recognized the authority of Winston [defendant's agent] to execute the order, [i. e. the note sued upon] and that no defense would be interposed to its payment when due."
It was Shlifer, not the Board, who warranted both the delivery of the merchandise and its "compliance" with the law, and when the Board accepted the assignment, it was not thereby underwriting Shlifer's warranties. Its "acknowledgement" and "acceptance" of the assignments amounted in effect to its saying to the assignee only this: "Whatever payments are ultimately found to be due Shlifer for the liquor covered by these invoices will be made not to him but to you, his assignee." Nothing the Board said invested the assignee with any greater rights to payment for the merchandise than the assignor possessed.
Holding as we do that the elements which would warrant the plaintiff involving an equitable estoppel against the defendant are not present here, it is not necessary to discuss the questions raised as to (A) whether the State Liquor Control Board is engaged in a governmental or proprietory function, and (B) whether an estoppel can be invoked against the Commonwealth by reason of its agent's silence in the face of the warranty by the assignor (the state's creditor) to the assignee in respect to the delivery of the merchandise by the assignor to the state, and (C) whether any authorized officer or agent of the Board acquiesced in any warranty of delivery.
Since delivery of liquors in the amount of $14,642.00 on order number 42814 was not made and since the Commonwealth is not estopped in this action from proving *Page 200 
such non-delivery, the claim for $14,642.00 on the above order was rightfully disallowed. The claim of $1,017.00 on the purchase order number 43378 was for the same reasons likewise properly disallowed for failure to deliver the merchandise specified.
On March 3, 1938, the Board issued orders numbers 50896, 50897, 50898 and 50899 totalling $13,742.50. Four days later Shlifer applied to the bank for a loan and assigned the sum of $13,220.00 to be due under those orders and delivered the appropriate invoices, with the usual notice to the Board and its customary acknowledgement. Schlifer delivered merchandise to the value of $9,764.50 on order number 50896 and none on the other three. The Bank claimed the sum just stated and it was allowed, subject to set-offs and counter-claims hereinafter discussed. The Bank's claim of $98.00 by virtue of an assignment to it of the balance supposedly due, $522.50 on order number 50896 was properly disallowed for non-delivery of the liquor. The Bank had loaned Shlifer $522.50 on March 8, 1938, on account of this unfilled "balance of order" and assignment but it was later notified by the Board that "undelivered balances" on this order had been cancelled. The Bank had advanced only $98.00 after receipt of the acknowledgement of the assignment.[1]
Three additional claims of the Bank on the following orders and for the following amounts, respectively, were properly allowed because the merchandise was received: (A) numbers 51231 and 51536: $463.80 (B) number 51792: $386.50 (C) numbers 52268 and 52269: $309.20. The total sum thus found to be due the plaintiff by the defendant on assigned orders (including the amount due on order number 50896, supra) was $10,924.00.
The Commonwealth's counter-claims against this sum *Page 201 
are $3,951.76. All but one[2] of the counter-claims are based on facts not existing at the time of the assignments. The Bank's objections to these counter-claims are (1) that the Board has not shown that the items of deductions would have been valid against Shlifer even if there had been no assignments and (2) that set-offs or counterclaims against an assignor after notice of assignments are not available to the debtor in an action against him by the assignee. We will now discuss the latter proposition.
The legal principles governing claims made either as recoupments[3] or set-offs are well settled; the decision in such cases depends upon the facts. Section 167(1) of the Restatement of Contracts enunciates this principle: "An assignee's right against the obligor is subject to all limitations of the obligee's right, to all absolute and temporary defenses thereto, and to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided that such defenses and set-offs are based on facts existing at the time of the assignment, or are based on facts arising thereafter prior to knowledge of the assignment by the obligor."
The counter-claim asserted need "not be due and payable at or before the assignment." (57 C. J. sec. 152, p. 486); it is enough if it is "based on facts" existing at that time. ". . . the fact that the demand claimed as an offset has not matured when defendant receives notice of the assignment of his obligation does not render it unavailable as a set-off or counterclaim; . . .": 57 C. J. sec. 153, p. 487. *Page 202 
In determining whether or not a set-off should be allowed "there is good authority to support the rule that the only questions should be (1) did the claim against the assignor exist whether matured or not, before notice of the assignment, and (2) were both claims matured when the set-off was asserted." (italics supplied): Williston on Contracts, Revised ed., Vol. 2, sec. 432.
The cases agree that the assignee of the creditor's end of a contract takes it cum onere,[4] and that by his creditor's assignment of a contract the debtor cannot be deprived of any of his legal or equitable defenses which subsist in that contract, and the assignee gets no higher right than the assignor had. In Rider v. Johnson, 20 Pa. 190, this court held that "the assignee of a chose in action, not negotiable, takes it subject to all the defenses to which it was subject in the hands of the assignor." This was equivalent to the oft-quoted statement of Lord Thurlow in Davies v. Austin, 1 Ves. 247, as follows: "A purchaser of a chose in action must always abide by the case of the person from whom he buys."[5]
The question before us comes to this: (1) Was the debt pleaded as a counter-claim due at the time of the notice of the assignment of the choses in action sued upon? (2) If no debt was then due, was the claim made, though it matured after notice of the assignment, based *Page 203 
on a right of the defendant inherent in the contract[6] sued upon? On this record these questions must be answered in the negative.
To prove its counter-claim the defendant relied on the testimony of C. G. H. Martin, Chief of the Disbursement Division, Bureau of Accounts, Pennsylvania Liquor Control Board. After this witness testified: "There are set-offs totaling $3,951.76." he replied to the question, "How are they made up?", as follows: "One of those is a credit memorandum issued by Rudolph Shlifer dated May 4, 1938, numbered 1453 in the amount of $0.40. We have a debit memorandum 2D17 dated March 31, 1938, in the amount of $166.50 which covers State Service, and furnish one to Rudolph Shlifer by the Penna. Liquor Control Board." He explained that "State service" were "reports of weekly sales of liquor by the Board" for which there was "a nominal charge" and that "practically every vendor availed himself" of this service. These questions and answers then followed:
"Q. There is also a debit memorandum of May 2, 1938, 5DS in the amount of $180.75 which is also a State Service. There is a debit memorandum of May 31, 1938, in the amount of $266.55 which covers miscellaneous claims, claims for damages, faulty packing, and similar small claims. There is also a debit memorandum of May 31, 1938, in the amount of $3,329.89 which covers floor stock credit. Explain what they are for. A. They are all the same where a vendor desires the retail price of his merchandise. It arises through a difference in price, a reduction in the retail price made by Mr. Rudolph Shlifer and covers the reduced value of the merchandise that we had in the State Store. One other item of an off-set a debit memorandum dated January 23, 1939, in the amount of $7.67 and that covers Pennsylvania State seals furnished Mr. Shlifer which were never paid for. Q. The total? A. The total of these deductions is $3,951.76." *Page 204 
There is nothing in the foregoing testimony showing that the debts claimed as a set-off existed or were even germinating at the time of the notice of the assignment. A set-offaccruing after such notice cannot avail a defendant. (Northampton Bank v. Balliet, 8 W S. 311, 318.) If the defendant had established its set-offs and had showed either that they existed at the time of the notice of the assignments or if they were not then matured they were inseparably connected with the dealings on which the claims sued for were based they would have been allowable. The counter-claimant's burden of proof was not met by the vague testimony it produced. The largest item of the set-off was $3,329.89 as a "floor stock credit" covering "the reduced value of the merchandise . . . in the State Store." Accepting the implication that this was Shlifer's merchandise, there is still wanting proof that Shlifer agreed when he sold it that he would allow a credit for its later "reduced value". We have here only the defendant'sclaim for a credit on account of this "reduced value". It is not unusual for the vendors of merchandise to allow to steady customers a credit when the thing sold, as, for example, an automobile, a short time after the sale is listed at a lower price, but such allowances are usually mere gratuities given in order to hold the customer's patronage. There is nothing in the contracts sued upon in this case (which had been assigned to the plaintiff) giving the slightest intimation that the debtor was entitled to a future credit on account of possible "reduced value" of the merchandise contracted for. There were no "factsexisting at the time of the assignment" on which the counter-claims here made are based. Under the evidence they amount to no more than credits claimed or gratuities asked for. Even if recognized as claims well founded in fact, they appear to have accrued after notice of the assignment and as such they are not available to the defendant.
In the lengthy opinion filed in this case by the Auditor General and State Treasurer they do not justify by the citation of any proof the above set-off of $3,329.89. *Page 205 
They merely say after citing the claim: "We are of the opinion that such agreement with Shlifer [for this credit] has been established." We have searched the record in vain for any evidence of any such agreement. The court below in its opinion pointed to nothing either in law or in fact justifying the allowance of this set-off. The court said: "It is true the board characterizes it as a set-off. That was a misnomer. What the board was speaking of was a lack either complete or partial, on the part of Shlifer in not filling some of the orders or invoices mentioned. It is not controverted by Shlifer or the bank that such partial or complete failures to fill certain orders did take place." The answer to that is that whenever it was shown that Shlifer failed "to fill certain orders", his assignee, the Bank, was not allowed to recover its claim based on such unfilled orders and herein we sustain the disallowance of such claims. The Bank's failure of proof in respect to the filling of these orders cannot be availed of by the defendant to make good its failure of proof in respect to the set-off it claims. We adjudge defendant's proof in respect to each and all of the above items of set-off inadequate.
The action of the Auditor General and State Treasurer in refusing to allow interest to the plaintiff on the amount found to be due was proper. "The State is not liable to pay interest on its debts unless bound by statute or by contract of its executive officers": Phila. v. Commonwealth, 276 Pa. 12, 14,119 A. 723. In the instant case no statute or contract calls for the payment of interest.
The action of the court below in dismissing plaintiff's appeal from the allowance to the defendant of a set-off in the sum of $3,856.03 is reversed.[7] Such set-off is hereby *Page 206 
disallowed and judgment is entered in favor of the plaintiff in the sum found to be due before any set-off was allowed, to wit, $10,924.00.
[1] The fact that certain sums were loaned by the Bank to Shlifer on this order prior to receiving the Board's acknowledgement of the receipt of the assignment is inconsistent with the Bank's claim, supra, that it made advances to Shlifer on the strength of the Board's "acquiescence in" Schlifer's warranties.
[2] See footnote seven at end of the opinion.
[3] A recoupment (literally a "cutting out") is a counter-claim arising out of the contract sued upon; a set-off is a counter-claim arising from an independent transaction. The former is a defensive; the latter an offensive, proceeding. Both liquidated and unliquidated damages may be recouped; recoupment is controlled by the principles of the common law.
[4] In the case of Gov't of Newfoundland v. Newfoundland Ry Co., 13 A. C. 199, the House of Lords stated: ". . . It would be a lamentable thing if it were found to be the law that a party to a contract may assign a portion of it, perhaps a beneficial portion, so that the assignee shall take the benefit, wholly discharged of any counterclaim by the other party in respect of the rest of the contract, which may be burdensome. . . ."
[5] Of course, "one having the right to a set-off may also estop himself from demanding that a credit be allowed, as by executing a certificate of no defense to one who acts on the strength thereof": Walker v. Emerich, 300 Pa. 9, 13,149 A. 881. Chief Justice GIBSON said in Metzgar v. Metzgar, 1 Rawle's 227, 230: it is the assignee's duty "to sound the obligor before he parts with his money, as to the amount actually due."
[6] Such a right may inhere in the contract by clear implication; or by law, for the law applicable to any contract is a part of that contract.
[7] Though the services reporting weekly sales of liquor and for which a set-off of $166.50 was claimed and allowed was rendered prior to the last two assignments sued upon, there is failure of proof that Shlifer contracted for this service or accepted it. It may be surmised that he did one or the other or both but surmise cannot be accepted as a substitute for proof.