H. Daroff & Sons, Inc., *v.* Vitullo et al., Appellants.

Argued October 2, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

502

 reargument re-
fused November 17, 1944.

*Lemuel B. Schofield,* with him *W. Bradley Ward,* for defendants, appellants.

*Nathan Siegel,* with him *Thomas I. Emerson, Fleming James, Jr., David London, Robert J. Callaghan* and *Sydney M. Friedman,* for intervenor, Administrator of Office of Price Administration, appellant.

*Morris Wolf,* of *Wolf, Block, Schorr & Solis-Cohen,* for plaintiff, appellee.

OPINION BY MR. JUSTICE LINN, October 31, 1944:

This appeal is from a decree restraining defendants, during the year 1944, from making or working on overcoats for anyone other than the plaintiff, a manufacturer of clothing in Philadelphia. The defendants [1] are Nicholas Vitullo and his three sons, trading as N. Vitullo & Sons. This partnership is a clothing contractor, a term, used in the Philadelphia clothing industry, to describe one who works on garments for a manufacturer of clothing. Both parties have been engaged in the industry for years. The bill was filed December 28, 1943, and was subsequently amended. Nicholas Vitullo defended on the ground that he neither made nor authorized the contract; his sons admitted [2] the contract, but,

---

[1] After the testimony had been taken, the Administrator of the Office of Price Administration intervened.

[2] In appellants' brief, it is said that "The testimony of Alfred and Augustus showed that the three boys in entering into the contract

inter alia, averred that it violated the federal statute[3] and regulations governing price administration.

On October 1, 1943, Michael Daroff, acting for the plaintiff, met in defendants' office at their plant, some or all of the defendants and their counsel, for the purpose of considering the terms of a contract by which defendants, as contractors, would tailor topcoats and overcoats for the plaintiff. Defendants' counsel made notes of the terms then agreed to and by October 5th had put the agreement in writing and delivered it to defendants. The party of the second part was described in the agreement as Alfred Vitullo, Augustus Vitullo and Henry Vitullo, individually, and trading as N. Vitullo and Sons. Nicholas Vitullo was not named. This draft of agreement was executed in the name of N. Vitullo & Sons and was signed by the three sons. They sent it to plaintiff for execution and plaintiff executed and delivered it.

Defendants' office, in which the parties met, is on the same floor of the building in which their tailoring plant is located and is part of it. At intervals during the time in which the terms of the agreement were under consideration, Nicholas Vitullo left the office and was in the shop. He had, however, as the learned chancellor found, ". . . had prior knowledge of the purpose of the meeting and was so near to those present, that he was aware of the terms of the agreement." The learned court, rejecting Nicholas Vitullo's contention that he was not a party to the contract, and that his sons were without authority to act for him, concluded, on ample evidence, that he was bound by it.

The contract provided that for the period of one year, beginning January 1, 1944, the defendants would make

hoped to be able to induce their father to sell his business and were confident of their ability to induce him to sell."

[3] 56 Stat. 23; 50 USCA section 901 et seq. as amended.

overcoats for the plaintiff to the capacity of their plant in Philadelphia. The plaintiff agreed to deliver to them a minimum of 1,000 coats per week to be manufactured by them and to pay therefor "(a) The amount paid for labor. (b) An expense amount equal to Twenty-two percent (22%) over and above the cost of labor. (c) Seven and one-half cents ($.07½) per each unit or coat to cover sewings."

Defendants not only agreed to do the work but also agreed ". . . not to do any other tailoring work during the continuance of this contract for any other manufacturer, person or corporation whatsoever, but shall devote all of their equipment and facilities entirely to work delivered to them by Daroff."

For some time prior to and during part of 1943, the defendants were engaged in working on overcoats for one, Segal, trading as the Windsor Overcoat Company. There is evidence of a local trade custom in the clothing industry in Philadelphia requiring a contractor employed by a manufacturer, to notify him of any proposed termination of the relationship. Accordingly, on October 8, 1943, defendants, having made their contract with plaintiff, notified Windsor Overcoat Company that they "will not be able to make any more work for you as of December 31, 1943." At the same time they also notified the Clothing Contractors Association and the Amalgamated Clothing Workers of America of the same fact.

There is evidence of a local trade custom pursuant to which the sufficiency of such notice of change in relationship of manufacturer and contractor, if challenged, shall be submitted to a named arbitrator. Such an arbitration was begun on behalf of Windsor Overcoat Company, but was discontinued for a reason given by defendants' witness, Flickstein (Secretary of the Philadelphia Clothing Manufacturers Association) in the following words: "A. It fell through because of the fact Vitullo said he did not want to go through with the Daroff contract, and did not want to go through

with the arbitration."[4] Rudow, called by defendants, testified: "Q. Then what happened? A. I received a call the evening before the arbitration was set—Friday night; the arbitration was to take place Saturday, and Friday night I received a call from Mr. Flickstein informing me there would be no arbitration meeting tomorrow. I said, 'Why?' He said, 'The firm of Segal has settled with Vitullo, and Vitullo does not intend to go through with the contract with Daroff.' In order to verify, Mr. Vitullo, Senior, told me I should telephone everything is all right; there will be no arbitration tomorrow. By Mr. Wolf: Q. Who told you? A. Nicholas Vitullo." As Vitullo withdrew from the arbitration, we need not consider the sufficiency of the notice as an element in defense.

Defendants continued, after January 1, 1944, to make overcoats for Segal, trading as Windsor Overcoat Company, but at compensation in excess of what they had received from Windsor Overcoat Company in 1942.

The plaintiff, to comply with its contract with defendants, had arranged for a supply of the cloth and materials necessary for the overcoats to be tailored by defendants and had notified defendants of that fact at the time of the agreement. After plaintiff learned that defendants would not perform their contract, it sought another contractor. In this search, it was aided by the Philadelphia Clothing Manufacturers Association, the Contractors Association, and the Union. The only available contractor was Mario Ranieri, though his plant was not equipped to make overcoats of the grade desired by plaintiff nor in anything like the quantity which defendants' plant was equipped to make.[5] He agreed to

---

[4] The 17th finding of fact is: "Before the matter of arbitration could be heard or decided, Nicholas Vitullo withdrew it from arbitration, made a new agreement with the Windsor Company and refused to comply with the terms of the written agreement with H. Daroff & Sons, Inc."

[5] The adjudication stated: "The Ranieri shop is what is known in the trade as a 'machine shop'. The plaintiff's type of garments are

do 800 garments a week. To render his plant available, it was also necessary to make important changes in it and to increase the number of employes, both elements being difficult because of conditions in the clothing industry. Ranieri had not made any deliveries when the testimony closed on January 12, 1944. The subject is now referred to merely to show that plaintiff apparently did all that could have been done and that it was impossible to find a substitute to do what defendants had agreed.

The evidence supports the essential findings made by the learned chancellor and, as they were approved by the court in banc, we must accept them: *Hagdorn v. Faust*, 348 Pa. 261, 35 A. 2d 75. The court was justified in concluding that Nicholas Vitullo was advised of the negotiations, that he participated in them, and, with his sons, intended to be bound; the adjudication deals with the evidence of his estoppel so fully that it is unnecessary now to repeat the learned chancellor's demonstration: compare *Oswald Mach. Co. v. Farnsworth*, 101 Pa. Superior Ct. 506, 510; *Northwestern Nat. Bk. v. Com.*, 345 Pa. 192, 27 A. 2d 20; *Bell v. Johnston*, 281 Pa. 57, 60, 126 A. 187; Act of March 26, 1915, P. L. 18, part III, section 16, 59 PS section 38.

Defendants contend that plaintiff's legal remedy for the breach of contract was adequate and that the injunction should have been denied. The contention must be rejected because the evidence is clear that there was no other available contractor to do what defendants had agreed to do. Plaintiff, with the assistance of the associations referred to, took the only step that could afford partial relief. To tailor a weekly minimum of 1,000 overcoats of the grades in question required adequate machinery and sufficient skilled employes. Plain-

sewed mainly by hand. The Ranieri shop must be reorganized and readjusted to do the work for the plaintiff and a different class of labor must be secured and employed. It is not a satisfactory substitute for the defendants' shop."

tiff had contracted for the output of defendants' plant which had a capacity of more than 1,000 garments a week, and defendants had agreed that no other competitor should have the output. For the refusal to perform, a mere action for damages was obviously an inadequate remedy. If the legal remedy is not adequate and complete, equity may take jurisdiction: *York Rys. Co. v. Driscoll*, 331 Pa. 193, 196, 200 A. 864; *Edison Illuminating Co. v. Eastern Pa. Power Co.*, 253 Pa. 457, 465, 98 A. 652; *Johnson v. Price*, 172 Pa. 427, 435, 33 A. 688. The record supports the decree restraining defendants from violating their covenant "not to do any other tailoring work during the continuance of this contract for any other manufacturer. . ." Compare *Phila. Ball Club v. Lajoie*, 202 Pa. 210, 51 A. 973; [6] *Bald Eagle Valley R. R. v. Nittany Valley R. R. Co.*, 171 Pa. 284, 33 A. 239; see Restatement, Contracts, Sec. 380; Williston, Contracts, Vol. 5, sections 1450, 1450A, 1450B.

The last of the defenses alleged in the answer is that the parties bargained for a price ". . . in violation of the maximum contractor's charges as established by Maximum Price Regulation No. 172 promulgated by the Office of Price Administration pursuant to the Emergency Price Control Act of 1942. . . ." Presumably both parties intended to make a lawful agreement.[7] What they did and proposed to do was of course subject to the Act of Congress and the authorized regulations of the Administrator. Plaintiff's presentation of its case did not disclose illegality. The burden of proving any fact

---

[6] See, also, *Butterick Pub. Co. v. Fisher*, 203 Mass. 122, 89 N.E. 189; *Peerless Pattern Co. v. Gauntlett Dry Goods Co.*, 171 Mich. 158, 136 N. W. 1113; *Butterick Pub. Co. v. Loeser & Co.*, 232 N. Y. 86, 133 N. E. 361; *Butterick Pub. Co. v. Rose*, 141 Wis. 533, 124 N. W. 647; *Phez Co. v. Salem Fruit Union*, 103 Ore. 514, 201 Pac. 222.

[7] They provided: "The terms of this contract shall be subject to change, alteration or cancellation by government regulations now in existence or which may be enacted covering the control, management or exercise of the business of the respective parties hereto."

rendering the contract unlawful was on defendants. We all agree the evidence will not support such a finding.

Appellants' argument depends on a bald comparison of two formulas: that, as defendants in 1942 received cost of labor plus 18% for contractor's services, and, as the plaintiff agreed to pay labor and 22% for contractor's services, a violation of federal law appeared because 22% is more than 18%. But comparison dealing with only part of the essential evidence cannot be accepted as conclusive. A proper comparison requires consideration of the effect of the additional 15 cents per garment allowed by the OPA in September, 1943, for contractor's services, as is shown in the finding quoted later in a note. This additional allowance was in effect when plaintiff and defendants made their contract and, as we understand it, applied to the entire industry in Philadelphia. William Flickstein, a witness called by defendants, testified that he was Secretary of the Philadelphia Clothing Manufacturers Association and that "around September, 1943," he, representing the Manufacturers, and Samuel Rudow, representing the Contractors Association, held meetings attended by Mr. Lodge, representing the Administrator, pursuant to which they and the Administrator's representative agreed that contractors should receive additional payments at the rate of 10 cents per garment on grade number 3 and 15 cents per garment on grades number 1 and number 2. There is no denial of this agreement or of Mr. Lodge's authority to act for the Administrator. Defendants made this increase the subject of a request for a finding of fact which was affirmed by the Chancellor, stating that the contractors, with the approval of the Administrator, ". . . should receive from manufacturers, in addition to the payments for services theretofore made . . ."[8] the sums specified per garment.

---

[8] The request, which was affirmed, was in these words: "On September 14, 1943, as the result of negotiations between representatives of clothing manufacturers and clothing contractors in Philadelphia,

This finding of fact was not excepted to by the Administrator and is established for the purposes of the case. Defendants' witness, Samuel Rudow, who represented the Contractors Association in the negotiation, also testified on the subject.

It is of course true that, if this increase be considered as a wage increase payable to such of the contractor's employes as made overtime, it will not increase the rate percent receivable by the contractor for his services; but if it was intended, as Mr. Rudow testified, to increase the contractor's compensation because his plant worked overtime, it would increase the 18 percent theretofore payable. Treating it as a payment for contractor's services, in accord with the finding, the question then becomes this: to what extent did it increase the 18 percent theretofore payable to the contractor? Mr. Rudow was asked what difference it would make in the percentage and answered, "It would make about twenty-two percent." He was also asked: "Q. The fifteen cents a garment went into labor cost, did it not; not the percentage of profit? A. The percentage of profit—I do not represent labor—it was not in the labor costs." At another place he was asked, "So the price that was being paid to Vitullo by Segal [Windsor Overcoat Co.] plus the fifteen cents increase on the price agreement, brings it to about twenty-two percent above the labor cost? A. Correct." Mr. Flickstein was asked with respect to this 15 cent allowance: "Q. In other words, the price was 18 percent plus fifteen cents per

occasioned by a demand on the part of contractors for additional payment from manufacturers to pay labor for overtime, it was agreed with the approval of the Office of Price Administration that from that day forward clothing contractors should receive from manufacturers, in addition to the payment for services, theretofore made, the sum of ten cents ($.10) per garment on Grade No. 3, and fifteen cents ($.15) per garment on Grades Nos. 1 and 2. This additional payment of ten cents per garment was made by Windsor Overcoat Company to NICHOLAS VITULLO on September 14, 1943, until October, 1943, at which time Windsor agreed to pay fifteen cents per garment retroactive to September 14, 1943."

garment, is that correct? A. Yes." From the evidence of the witnesses we understand that the 15 cent increase was not intended to be a mere wage increase because a wage increase would not have benefitted the contractors, though the purpose of the meeting appears to have been to benefit the contractors for operating their plants overtime; a mere wage increase would have gone into the cost of labor on which the contractor would have received only percentage allowed for his services, not an additional payment.

If the 15 cent increase in payment for contractor's services increased the total to 22 percent, no proof of violation of the regulations has been shown. It is true that Nicholas Vitullo testified that he received labor cost plus 18 percent, but, the learned chancellor was bound to deal with all the evidence, not only part of it. The testimony of the witness, Myers, that in March, 1942, and in August and September, 1943, Windsor paid the cost of labor and 18% may be true but is not inconsistent with the evidence of the operation of the 15 cents increase allowed by the OPA in September, 1943.

The contention of the OPA is thus stated in its brief: "The sole issue in this case is whether the goods to be manufactured for plaintiff were either the 'same or similar' to those previously manufactured for Windsor in March 1942 within the meaning of section 1389.53 (a) or whether they were 'the most closely related to articles of the same type' manufactured by defendants at that time within the meaning of section 1389.53 (c), either of which is subject to the Regulation. If either condition existed, then, since the percentage margin over direct labor costs was higher under the terms of the contract than that obtained in March 1942, the agreement was unlawful in that it contemplated the violation of the Regulation." The brief then goes on to say that the chancellor ". . . gave consideration to Section 1389.53 (a) only, in referring to 'similar' goods, and paid scant if any attention to Sec. 1389.53 (c) which

applies to articles 'most clearly related to articles of the same type' manufactured in March 1942." Counsel then add that ". . . we think that the goods to be manufactured for plaintiff were similar. to the goods manufactured for Windsor, still, even if that is not so, then certainly such goods were at the very least 'the most closely related to articles of the same type' manufactured in March, 1942." [9]

The defect in the argument is that it takes no account of the 15 cent increase approved by the Administrator in 1943. Whether plaintiffs' garments were the "same or similar" under (a) or "of the same type" under

---

[9] We quote relevant portions of the regulations from the brief filed on behalf of the OPA. "The provisions fixing the maximum prices which the contractor may charge the manufacturer are set forth in section 1389.53 of the regulation. These provisions read as follows:

"Section 1389.53. *Maximum contractors' charges.* The seller's maximum price for any service governed by this regulation shall be as follows:

'(a) *Where the material is consigned to the contractor.* The total of the following:

'(1) The direct labor cost of the service:

'(2) The same percentage margin over direct labor cost obtained by the contractor for the same or similar services in March 1942. . . .

'(c) *Where the Contractor cannot determine his price under (a)* . . . If the contractor cannot determine the maximum price for a service pursuant to paragraph (a) . . . hereof, the maximum price for such service shall be the total of the following.

'(1) Direct labor cost of the service, which shall be computed as in paragraph (a);

'(2) The same percentage margin over direct labor cost obtained by the contractor in March 1942

'(i) For the services rendered in connection with the manufacturing of the most closely related article of the same type; or

'(ii) If the contractor did not furnish services in connection with the manufacture of articles of the same type, then the same percentage margin over direct labor cost obtained by his most closely competitive seller of the same class in March 1942 for services performed on the manufacture of articles of the same type . . .' "

(c), the fact is that defendants have not shown that the Windsor price of cost of labor plus 18 percent, plus 15 cents a garment payable for the manufacturers' services, is less than the cost of labor plus 22% agreed to be paid to defendants. The learned chancellor found: "25. There is not sufficient satisfactory evidence for the Chancellor to find that the price agreed to be paid by H. Daroff & Sons, Inc. to N. Vitullo & Sons is in excess of the price paid as of March, 1942, for similar work, as is provided in the regulations of the Office of Price Administration." We are in accord with that conclusion, understanding that the 15 cent increase per garment was approved by the OPA in September, 1943.

Decree affirmed, costs to be paid by defendants.