AMERICAN KITCHEN FOODS, INC., Plaintiff,

v.

HERSCH COLD STORAGE COMPANY, Paul J. Seligson, Erie Farms, Incorporated, Security Peoples Trust Company and Sky Brothers Company, Defendants.

Civ. A. No. 75–137 Erie.

United States District Court, W. D. Pennsylvania.

Aug. 10, 1977.

---

Theodore B. Ely, Erie, Pa., for plaintiff.

Harold Gondelman, Pittsburgh, Pa., John M. McLaughlin, Erie, Pa., for defendant Paul J. Seligson.

William R. Brown, Erie, Pa., for defendants Security Peoples and Sky Brothers Co.

Warren W. Bentz, Erie, Pa., for defendant Erie Farms, Inc.

## OPINION

WEBER, Chief Judge.

The present action arose after defendant Security Peoples Trust Company (SPT), possessing a security interest in the inventory of Erie Farms, Inc. (EFI), a food wholesale distributor, sold frozen food products allegedly belonging to the plaintiff, American Kitchen Foods, Inc. (AKF), to Sky Brothers Company at a distress sale. AKF bases its ownership rights on a warehousing arrangement between AKF and Hersch Cold Storage Company (HCS), a cold storage warehousing operation, and sister entity of EFI. AKF alleges that due to the public nature of HCS, certain goods found in the HCS facility were owned by AKF and not covered by the SPT security interest in the EFI inventory.

In its complaint, AKF alleges that the defendants "willfully and maliciously converted" certain potato products belonging to AKF, and valued at $91,480.38. Presently, AKF moves for summary judgment alleging the absence of a genuine dispute as to any material fact. Defendants SPT and Sky Brothers oppose entry of summary judgment.[1]

EFI was a wholesale distributor of primarily wholesale foods. EFI's principal and sole shareholder was Paul J. Seligson, a defendant in this case. Seligson also controlled HCS by reason of his personal holding of a minority of the voting stock of HCS, the majority stock held by Seligson's EFI. Seligson had acquired the interests of EFI and HCS in 1971 or 1972 from Louis Hersch. Louis Hersch continued to occupy an office in the complex.

HCS owned all the realty occupied by EFI and HCS, subject to a mortgage held by SPT and consisting of a large complex of buildings, situated in close proximity to one another. One of the buildings was an eight

---

1. As to the defendant Hersch Cold Storage Company, default judgment has previously been entered in favor of AKF in the amount of $91,480.38. Defendant Paul J. Seligson concedes that no material fact is in dispute but contends that the present facts do not support a finding of liability against him for conversion.

story refrigerated warehouse occupied by EFI for its wholesale food distribution business. HCS leased the entire facility to EFI, excepting the top two floors which were used for HCS cold storage.

In 1972, Seligson decided to phase HCS out of the public warehousing business. However, a small amount of warehousing continued up to the time of the bankruptcy of EFI. Late in 1974, AKF began storing its products at the HCS warehouse; AKF products constituted the greatest share of the several firms "warehousing" with HCS in February of 1975. Prior to this time, AKF sales were made directly to its area distributor, EFI. This pattern changed following the visit of AKF executive vice-president, T. B. Angelos, to EFI. Angelos' visit was prompted by rumors circulated in the food products trade and industry that EFI was experiencing financial difficulties. At the time, EFI owed AKF between $30,-000 and $40,000. Angelos met with Seligson and Hersch at the EFI and HCS facility and worked out a warehousing arrangement with HCS for future AKF deliveries. Subsequent to this meeting, direct deliveries to EFI ceased and deliveries to HCS commenced. In order for EFI to purchase and receive AKF products stored with HCS, EFI was required to telephone its order to AKF, then, send AKF a written confirmation of the transaction in the form of a purchase order. If the requested goods were available, only Linda Schwab, office and credit manager of Potato Service, Inc., a subsidiary of AKF, could authorize the release of the goods by calling HCS. The taking of possession and subsequent sale by SPT of these frozen potato products constitute the subject matter of this lawsuit.[2]

Prior to January 1975, SPT had viewed EFI and HCS as excellent credit risks and had extended large amounts of credit to EFI. However, in late January, large checking account overdrafts required SPT to investigate EFI's financial situation. In order to assure SPT that EFI remained an "excellent credit risk", Seligson submitted an inventory computer print-out. SPT subsequently learned that the print-out was inaccurate in that it was inflated to three times the actual inventory. Subsequent to February 13, 1975, SPT as a secured creditor with a perfected security interest in EPI's inventory, took possession of the goods contained in the entire refrigerated building, assuming it all to be EFI inventory, at the time unaware of any outstanding warehouse receipts. During the week of February 17, 1975, for various reasons, SPT, as creditor in possession, felt it imperative to liquidate the collateral as quickly as possible. On March 6, 1975, the entire warehouse inventory was sold to defendant Sky Brothers at a distress sale.[3]

Critical to the resolution of his case is whether AKF entered into and maintained a bona fide warehousing arrangement with HCS, thereby effectively preventing SPT from enforcing its security interest in the frozen potatoes. After considering the pleadings and evidentiary material in form of affidavits, depositions and admissions on file, and resolving all inferences and doubts and issues of credibility in favor of the nonmoving parties, it appears that summary judgment is appropriate since there exists no dispute as to a material fact. *Suchomajcz v. Hummel Chemical Company,* 524 F.2d 19 [3d Cir. 1975].

In support of its motion for summary judgment, plaintiff has produced documents of title (bills of lading and warehouse receipts) and supporting evidence sufficient

---

2. On December 26, 1974, AKF caused some of its goods stored in the HCS facility to be delivered to EFI. These goods are not part of the claim by AKF and there is no dispute that they were in the custody of EFI at the time of its bankruptcy having been transferred by HCS following authorization by AKF. EFI was adjudicated bankrupt on March 12, 1975.

3. Prior to the sale to Sky Brothers, SPT authorized the release of certain property stored by the Erie School District at the HCS/EFI facility. Dog food was also stored at the warehouse and permitted to be reclaimed by its bailor. It is unclear whether SPT or the trustee in bankruptcy authorized the release. In any event SPT admits that it did not consider the dog food part of the EFI inventory since it did not appear on the inventory print out.

to establish a prima facie case of a bailment through the use of a warehousing arrangement. The authenticity of the documents evidencing this is not disputed nor do SPT and Sky Brothers allege any fraudulent participation by AKF in a fictitious warehousing operation. However, defendants SPT and Sky Brothers claim that HCS and EFI were actually a single corporate enterprise and as such AKF cannot protect its dealings with HCS on the basis of establishing that HCS was a public warehousing operation and a corporate entity separate and distinct from EFI. These defendants also claim an estoppel of the plaintiff to assert the benefits of its apparent property interest by reason of the warehousing arrangement due to AKF's failure to investigate properly the relationship between EFI and HCS prior to entering the arrangement with HCS. Defendants contend that AKF, in these circumstances, was under a duty to inquire about the financial structure of HCS, there being certain indicia of lack of a bona fide warehousing operation into which a reasonable business enterprise would inquire, i. e., customer and warehouse located in the same building, rumors in the trade that EFI was faltering, a substantial debt owed by EFI to AKF, and, the absence of bonded warehousing. Defendants contend that had AKF simply availed itself of the standard credit reporting systems, it would have been apprised of the fact that Seligson controlled EFI and EFI was the reported owner of HCS, and, by failing to so inquire, AKF is now estopped from asserting any ownership claim to the subject potatoes.[4] Therefore, SPT and Sky Brothers allege that a dispute as to a material fact exists because, under the circumstances, AKF, operating as a reasonable business enterprise, was put on inquiry notice of the absence of a true warehousing operation prior to entering the arrangement with HCS.

■ The rule that a corporation for most purposes is an entity distinct from its individual members or shareholders has

been said to be a legal theory introduced for purposes of convenience and designed to serve the needs of justice. However, the fiction of a corporation as an entity distinct from the individuals comprising it will be disregarded whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby. *Gagnon v. Speback,* 389 Pa. 17, 131 A.2d 619 [1957]; *Pasos v. Ferber,* 263 F.Supp. 877 [M.D.Pa.1967], aff'd, 386 F.2d 452 [3d Cir. 1967]. Those wishing to have the court disregard the corporate entity have the burden of establishing by a preponderance of the evidence that the corporation was an artifice and a sham designed to execute an illegitimate purpose in abuse of the corporate entity and the immunity that it creates. However, when piercing the corporate veil the court must start from the general proposition that the corporate entity should be recognized and upheld unless specific, unusual circumstances call for an exception. *Zubik v. Zubik,* 384 F.2d 267 [3d Cir. 1967], cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 [1968].

In the present case, defendants SPT and Sky Brothers allege that the control of HCS and EFI by Seligson justifies the disregarding of the corporate form in this instance. Possibly, such a conclusion would follow if Seligson was using the corporate entity to shield his dealings with some injured third party. However, this is not the case. Here, a defendant corporation is not raising the corporate defense to prevent the imposition of personal liability upon those controlling the corporation. Rather, SPT and Sky Brothers seek to have the corporate entity of HCS disregarded as to its dealings with AKF to prevent AKF from claiming the existence of a true bailment or warehousing arrangement.

■ The usual circumstances for disregarding the corporate form and the immunities flowing therefrom occur when it is

---

4. At an earlier stage of the proceedings SPT raised an additional defense under the U.C.C., 12A P.S. § 2–326. At oral argument and in its supplemental brief in opposition to summary judgment, SPT abandoned this position and now relies solely on the unitary business enterprise and estoppel theories.

"determined that the corporate fiction is being used by the corporation *itself* to defeat public convenience, justify wrong either to third parties dealing with the corporation, or internally between shareholders . . . (or the corporate form is used to) perpetrate a fraud or some other similar reprehensible conduct." *Sams v. Redevelopment Authority,* 431 Pa. 240, 244–245, 244 A.2d 779, 781 [1968] *(emphasis added).*

■ Since HCS is not using *its* corporate structure to protect an improperly obtained corporate advantage, we disagree with the contention of the defendants of the propriety of disregarding HCS's corporate existence in this instance. Piercing HCS's corporate veil in order to preclude AKF from asserting that it transacted business with a distinct and viable entity would be an unwarranted use of this equitable remedy. No allegations are made that HCS was formed with an intent to perpetrate a fraud nor is the corporate fiction being employed as a means to shield HCS from its ultimate responsibilities and liabilities; therefore, HCS stands immune from the piercing operation. *Sams v. Redevelopment Authority,* supra; *Chengelis v. Cenco Instrument Corp.,* 386 F.Supp. 862 [W.D.Pa.1975], *aff'd,* 523 F.2d 1050 [3d Cir. 1975].

■ The defendants also assert that despite AKF's and HCS's compliance with the formalities of a true warehousing arrangement and HCS's *de jure* corporate existence, AKF should be estopped from claiming any property interest in the warehoused goods due to its failure to investigate properly its potential warehouseman. It is contended that such an inquiry would have notified AKF of the HCS/EFI relationship and that HCS was not a bona fide public warehouse.[5]

This court is not aware of any legal standard imposing a duty on a bailor to examine the financial background and ownership structure of his bailee for hire prior to entering the proposed arrangement. Defendants cite no authority imposing a duty on a bailor to inquire but indicate, under the circumstances, an equitable duty arose, the failure of which is culpable negligence on the part of AKF serving as the basis for an estoppel defense.

■ The essential elements of an equitable estoppel are inducement by the party sought to be estopped, to the party who asserts the estoppel, to believe certain facts to exist, and, the party asserting the estoppel acting in reliance on that belief. *Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841 [1975]; *Sabino v. Junio,* 441 Pa. 222, 272 A.2d 508 [1971]. Thus, Pennsylvania law requires an interplay of the conduct by the party sought to be estopped and the party seeking the estoppel as demonstrated by an important principle that must be considered prior to permitting the use of the estoppel defense:

> There can be no equitable estoppel where the complainant's act appear to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on

---

5. HCS was a licensed, cold storage facility as required by the Pennsylvania cold storage act, 31 P.S. § 964 [1949]. A question appears to exist as to whether HCS adequately marked, stamped or tagged the potatoes "warehoused" in its facility. Under the act, a licensee is required to number articles by lot in accordance with the rules and regulations of the Department of Agriculture of the State, 31 P.S. § 966 [1965]. However, the act also provides penalties, i. e. fine and/or imprisonment, in the event of non-compliance, 31 P.S. § 976 [1949]. These penalties are directed against the negligent licensee and not toward the party dealing with the licensee, therefore, no statutory provision in the act would prevent AKF from exercising ownership rights in the goods stored with HCS even if it is later determined that HCS had violated the act. Apparently defendants agree with this conclusion since no statutory requirement has been offered by way of defense to bar AKF's ownership rights.

them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise. *Northwestern Penna. Bank v. Commonwealth,* 345 Pa. 192, 197, 27 A.2d 20, 23 [1942]. However, in applying an estoppel defense the court must first determine whether an estoppel results from the established facts. "It is for the jury to say whether alleged remarks were made, but it is for the court to decide whether they are susceptible of the inferences attributed to them." *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 96, 204 A.2d 473, 476 [1964].

The present record reveals that the conduct relied on by SPT in proceeding with the sale of the frozen potatoes consists of: the inflated inventory print-out showing the entire merchandise in the refrigerated warehouse as belonging to EFI; the statement of Lyle Scwab, EFI warehouse manager, that all goods stored in the HCS/EFI facility were EFI inventory; and, the alleged lack of any segregation, marking or other indication of warehoused goods by HCS.[6] No representations were made by AKF that they did not in fact own the goods stored with HCS, rather, AKF affirmatively represented to SPT that it owned the potato products in the HCS warehouse. These representations in the form of telephone calls, were received on February 28, 1975, and March 6, 1975, by Thomas Manucci, Senior Vice-President of SPT and special "account officer" to EFI. Therefore, SPT's reliance is placed only upon statements and acts of Seligson and other EFI employees. It appears that no act of the party against whom the estoppel is asserted induced SPT to assume that the potatoes were actually a part of the EFI inventory. SPT's action is the result of its own decision that HCS did not warehouse any AKF products. The belief that the frozen potatoes were part of the EFI inven-

tory was not the result of an AKF representation upon which SPT could justifiably rely and therefore no facts are present from which a jury could find the existence of the reliance and inducement elements of the estoppel defense.

Notwithstanding the claims of AKF regarding the frozen potatoes at the HCS warehouse, other factors exist which indicate that SPT was obliged to inquire further into the true ownership of the goods found in the HCS/EFI facility.

SPT, in the capacity of depository and lender, had a long standing relationship with the affairs of HCS and EFI, and their predecessors. A loan from SPT enabled Seligson to finance the purchase of EFI from Louis Hersch in 1972. According to Seligson, advice in 1972 from Sumner H. Nichols, then president of SPT, contributed to splitting HCS from the merged EFI and HCS in order to take advantage of the maximized borrowing power of two distinct and separate corporations. Seligson also testified at deposition that he assumed SPT was aware of the public warehousing operation carried on by HCS due to this intimate relationship between the bank and HCS. SPT admits that it knew that HCS warehoused liquor for the state of Pennsylvania. SPT also admits that it was aware, prior to the delivery of the potatoes to Sky Brothers, of the existence of non-EFI inventory in the HCS/EFI facility consisting of dog food and other food obviously not for resale but belonging to the School District of the City of Erie.

By letter of February 19, 1975, Seligson's attorney advised SPT that HCS had issued warehouse receipts for merchandise stored by the public on HCS premises, and, that those goods may be subject to the existing rights of the holders of those receipts. SPT also received notice of AKF's claim of a

---

**6.** A great deal of deposition testimony is concerned with the alleged failure of HCS to properly segregate those goods "warehoused" with it, presenting a factual question as to whether segregation by HCS actually occurred. Resolution of this question is not material to the outcome of this dispute and therefore the exist-

ence of a disputed fact in this respect will not prevent entry of summary judgment. Relevant to our inquiry is what was represented to AKF concerning its storage of goods in the HCS facility and not what actually took place subsequent to the delivery of the AKF products to HCS.

property interest in goods stored at HCS directly from AKF. SPT never contacted these parties subsequent to receiving the notifications in order to determine the validity of their claims. Instead, SPT assumed control of the entire refrigerated building, justifying its position on the basis of the Schwab statement and the false computer print-out describing an inventory SPT knew was inflated as to value and quantity.

During the period when SPT assumed possession of the alleged EFI inventory and its subsequent delivery to Sky Brothers, SPT never approached anyone affiliated with HCS to discuss existence of warehouse receipts or other records relating to goods stored with HCS. Doris Marquardt was office manager of HCS and in charge of record keeping at HCS. Marquardt remained with the company prior and subsequent to the sale to Sky Brothers. SPT was aware of her position yet never discussed with her the AKF claim after receiving calls from the AKF attorneys. Marquardt testified at deposition that, had she been asked by SPT, she could have verified the existence of an outstanding interest in, and warehouse receipts for, the frozen potatoes claimed by AKF.

The above facts indicate that SPT knew of, or could readily ascertain, facts justifying the AKF claim. SPT cannot now claim an estoppel of AKF to assert its ownership rights in the subject potatoes. Having concluded that SPT has failed in this respect, it follows that SPT and Sky Brothers are liable for conversion.

"The Pennsylvania courts define conversion as the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without legal justification. *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 197 A.2d 721 [1964]." *Welded Tube Co. of America v. Phoenix Steel Corp.,* 512 F.2d 342, 345 [3d Cir. 1975]. When SPT sold the AKF frozen potato products to Sky Brothers and Sky Brothers accepted delivery thereof, both SPT and Sky Brothers converted them and became liable to AKF for the fair market value of those goods.

We therefore find that there is no material issue of fact governing the claim of AKF against SPT and Sky Brothers, and judgment of liability will be entered against these defendants. With respect to AKF's claim against Paul J. Seligson individually there remain questions of fact to be determined with respect to his liability. The liability of all other parties and the liabilities of the defendants inter se to AKF remain to be determined to the extent that they are not mooted by the present determination.

Partial summary judgment will be entered accordingly.