**HOME FOR CRIPPLED CHILDREN d/b/a Rehabilitation Institute of Pittsburgh, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Pennsylvania Automotive Association Insurance Trust Fund, and Connecticut General Life Insurance Company, Defendants.**

Civ. A. No. 82–0631.

United States District Court, W.D. Pennsylvania.

June 27, 1984.

Frederick J. Francis, Joseph A. Vater, Jr., Pittsburgh, Pa., for plaintiff.

Nora Barry Fischer, Pittsburgh, Pa., for defendant Prudential Ins. Co. of America.

James H. Webster, Pittsburgh, Pa., for defendant Pa. Auto. Ass'n.

Ira S. Lefton, Pittsburgh, Pa., for defendant Conn. General Life Ins. Co.

## OPINION

MANSMANN, District Judge.

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff Home for Crippled Children d/b/a

Rehabilitation Institute of Pittsburgh (the "Home") and by Defendants Prudential Insurance Company of America ("Prudential"), Pennsylvania Automotive Association Insurance Trust Fund ("PAA") and Connecticut General Life Insurance Company ("Connecticut General").[1] Also before the Court is a motion to dismiss filed by Connecticut General with respect to a cross-claim filed by Prudential and PAA. Plaintiff brought this action to recover benefits under group insurance policies. For the reasons set forth below, Plaintiff's motions against Prudential and PAA are granted and their cross-motions against Plaintiff are denied. Plaintiff's motion against Connecticut General is denied and the motion filed by Connecticut General for summary judgment on its counterclaim is granted. Finally, Connecticut General's motion to dismiss the cross-claim is granted.

\* \* \*

## FACTUAL BACKGROUND

The Home is a Pennsylvania corporation with its principal place of business in Pittsburgh. The Home is engaged primarily in providing rehabilitation services to children.

Prudential and Connecticut General are incorporated and have their principal places of business in states other than Pennsylvania.

PAA is a trust with its principal place of business in Harrisburg, Pennsylvania.

Jason Sentner, child of Robert and Deborah Sentner,[2] was born on October 9, 1976 with cerebral palsy. His cerebral palsy was diagnosed in December 1977 by Anna Chorazy, M.D.

The Home treated Jason for his cerebral palsy on an outpatient basis during 1979 and 1980. Because Jason failed to progress under the outpatient treatment, he was admitted to the Home as an inpatient on or about January 8, 1981. Jason remained an inpatient at the Home until August 21, 1981, after which time he continued to receive treatment and therapy from the Home on an outpatient basis.

At various times from August 1, 1977 through August 14, 1980, Robert Sentner was an insured under a health and welfare plan (the "PAA Plan") provided to automobile dealers by PAA.[3] Additional premiums were paid for dependent coverage for Mr. Sentner's children, including Jason. The Plan provides certain benefits under group insurance policies purchased from Prudential.[4] PAA paid for certain outpatient treatment that Jason received in 1979 and 1980.

In the fall of 1977, Deborah Sentner procured insurance coverage for herself through her employer, Servico, Inc. ("Servico"). Servico makes available to its employees insurance coverage under a group health and accident insurance policy issued by Connecticut General (the "Servico Policy").[5] When Mr. Sentner's employment terminated, Mrs. Sentner procured dependent coverage under the Servico Policy in order to obtain insurance coverage for her children, including Jason. Jason was insured under the Servico Policy as of September 9, 1980.

Both Robert and Deborah Sentner assigned their rights under their respective insurance programs to the Home for purposes of Jason's care and treatment.

---

1. Plaintiff filed a separate motion for summary judgment against each Defendant. Likewise, each Defendant filed a separate motion against Plaintiff.

2. Robert and Deborah Sentner were separated in December 1978 and divorced in July 1980. Deborah Sentner subsequently married Christopher Blaisdale in June 1982 and changed her name to Deborah Blaisdale. In the interest of simplicity, however, we shall refer to Jason's mother as "Deborah Sentner" or "Mrs. Sentner."

3. Mr. Sentner was employed by various automobile dealerships during this period of time including Bob Delancey Lincoln Mercury, Bridgeville Sales and Monroeville Dodge. His employment with Monroeville Dodge terminated on or about August 14, 1980.

4. The group insurance policies are nos. G–8450, GV–8450, GD–3260 and GH–1700.

5. This group insurance policy is no. 0460349–05.

On or about April 17, 1981, Connecticut General paid $5,522.43 to the Home as an initial reimbursement of costs incurred by the Home for Jason's inpatient treatment. By letter dated May 20, 1981, however, Connecticut General requested from the Home a refund of the amount paid, stating that Jason was not covered by the insurance policy. By subsequent letter to Plaintiff's counsel, Connecticut General advised that under the group policy, it should only have paid $750 to the Home because Jason's cerebral palsy was a pre-existing condition. Since under the pre-existing condition clause of the policy Jason's treatment would be covered after he was insured for one year, the previous overpayment would be subtracted from charges submitted after the one-year period.

In August 1981, the Home submitted a claim to PAA in the amount of $54,654.00 for Jason's inpatient care during the period January 8, 1981 to August 21, 1981. PAA and Prudential denied the claim based upon Jason's condition and a provision in the PAA Plan called a "dependent deferral provision." PAA also noted that its previous payments were made in error.[6]

Plaintiff then brought the present action against Prudential, PAA and Connecticut General to recover the cost of Jason's inpatient care at the Home from January 8, 1981 to August 21, 1981.[7] Plaintiff's claims against Prudential and Connecticut General are predicated upon diversity jurisdiction. Its claim against PAA is based upon section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132.

Connecticut General has filed a counterclaim against Plaintiff to recover the amount it allegedly overpaid beyond the $750 to which the Home was entitled under the pre-existing clause of the group policy.[8]

Prudential and PAA have also filed a cross-claim against Connecticut General seeking contribution or indemnification.

All parties have moved for summary judgment. Connecticut General has also moved to dismiss the cross-claim filed by Prudential and PAA.

\* \* \*

APPLICABLE STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Court of Appeals for the Third Circuit has made clear that any doubts as to the existence of genuine issues of fact are to be resolved against the moving parties. *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982); *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981). Further, the facts and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Continental Ins. Co. v. Bodie, supra* at 438; *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 404 (3d Cir.1981).[9]

Under Rule 56(e), however, a party resisting a summary judgment motion may not rest upon the mere allegations or denials of his pleading. *Ness v. Marshall,* 660

---

**6.** In March 1981, PAA informed Mr. Sentner's prior employer, Monroeville Dodge, that previous payments totalling $6087.30 were made in error but that PAA was not seeking reimbursement.

**7.** Plaintiff seeks to recover $54,654.00 from Prudential and PAA. Plaintiff seeks to recover $49,-588.40 from Connecticut General. Plaintiff also requests interest and attorney's fees.

**8.** The figures indicate that the amount of the overpayment would be $4772.43.

**9.** The burden also lies with the moving party on a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim, such as that filed by Connecticut General as to the cross-claim. On such a motion, the plaintiff or cross-claimant is afforded the safeguard of having all of its allegations taken as true and having all inferences drawn in its favor. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

F.2d 517, 519 (3d Cir.1981). In opposing the motion, his response "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." *Id.*

Where cross-motions for summary judgment are presented, each side essentially contends that there are no issues of material fact from the point of view of that party. The court must therefore consider each party's motion for summary judgment separately. Since each side is moving for summary judgment, each side bears the burden of establishing a lack of genuine issues of material fact. Such inherently contradictory claims do "not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives ... determination whether genuine issues of material fact exist." *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968). Moreover, the standards under which the court grants or denies summary judgment do not change by virtue of cross-motions being presented. *Daburlos v. Commercial Ins. Co. of Newark, N.J.,* 367 F.Supp. 1017, 1020 (E.D.Pa.1973).

As a general rule, courts do not favor the summary disposition of cases on their merits. Nevertheless, in an appropriate case, an early disposition may save the parties needless and often considerable time and expense which otherwise would be incurred during trial. Thus, summary judgment is a useful tool when the record reflects that there is no genuine dispute over the critical facts. *See Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982).

With the above standard in mind, we shall proceed to consider the various claims and contentions of the parties.

\* \* \*

## I. CLAIMS AGAINST PRUDENTIAL AND PAA

Prudential and PAA rely upon the dependent deferral provision in the PAA Plan as the basis for refusing to pay the Home the cost of Jason's inpatient care and treatment from January 8, 1981 to August 21, 1981. The provision in question, entitled "Deferment of a Dependent's Insurance," states:

> The Employee is insured with respect to all the qualified dependents which he has or may later acquire, except as hereafter provided.

> If, on the date the basic dependents coverage would otherwise become effective with respect to a qualified dependent, such dependent is confined in a hospital, the insurance with respect to that particular dependent will be deferred until the dependent's final discharge from the hospital.

> If, on the date the dependents major medical insurance would otherwise become effective with respect to a qualified dependent, (except in the case of a newborn child), such dependent is confined in any institution for care or treatment of bodily disorder, mental infirmity or bodily injury or is unable because of one or more of them to carry on the regular and customary activities of a person in good health and of the same age and sex whether or not so confined, or was so confined or unable to carry on such regular and customary activities at any time during the thirty-one day period immediately prior thereto, the dependents major medical insurance with respect to such dependent will not then take effect. In lieu thereof, such insurance will, subject to any requirements of the Group Policy as to employee major medical insurance and basic dependents coverage, take effect on the last day of a period of thirty-one consecutive days during all of which such dependent carried on the regular and customary activities of a person in good health and of the same age and sex, and was at no time during such period so confined. However, if the Employee furnishes evidence of the insurability of such dependent, without expense to the Insurance Company, before the end of such period and the Insurance Company determines such evidence to be satisfactory as of a date prior thereto, then such insurance will take effect on such date, subject to any requirements of the Group Policy as to employee major medical insurance and basic dependents coverage.

In no event shall the dependents major medical insurance take effect with respect to a qualified dependent, if such dependent received benefits equal to or more than the Individual Maximum applicable to qualified dependents when covered an Employee prior to becoming a qualified dependent, unless the Employee furnishes, without expense to the Insurance Company, evidence of insurability satisfactory to the Insurance Company, of such dependent.

Plaintiff contends that the provision in the PAA Plan is unenforceable under a case decided by the Commonwealth Court of Pennsylvania, *Life Ins. Co. of No. America v. Commonwealth Ins. Dept.,* 43 Pa.Commw. 282, 402 A.2d 297 (1979).

Alternatively, Plaintiff asserts that the provision is unenforceable because it imposes a limitation which is more stringent than that permitted by the regulations of the Pennsylvania Insurance Commissioner (the "Commissioner").

Plaintiff further argues in the alternative that Prudential and PAA have waived their right to enforce the dependent deferral provision or are estopped from raising the provision as a defense because PAA paid the Home's claims arising out of Jason's outpatient treatment.

Prudential and PAA contend that the case proferred by Plaintiff, *Life Ins. Co. of No. America, supra,* is not applicable to the instant case.

They further assert that the dependent deferral provision is less restrictive than that permitted by the Commissioner's regulations.[10]

Moreover, they maintain that they have not, by their conduct, waived their right to enforce the dependent deferral provision nor are they estopped by their conduct from denying coverage.

\*     \*     \*

The PAA Plan provides benefits for hospital confinement under its hospital benefit provisions. Jason's inpatient treatment at the Home, however, is not covered under this portion of the Plan because more than three months lapsed from the time the insurance expired as a result of the termination of Robert Sentner's employment to the time Jason was admitted to the Home as an inpatient in January 1981.

Coverage for Jason's inpatient care exists, if at all, under the major medical expense provisions in the Plan. Under the major medical portion of the Plan, coverage for an illness causing total disability is extended for the benefit year following that in which insurance is terminated if the insured is totally disabled from that illness and under the care of a physician at the time of the termination. No one disputes that Jason was totally disabled and under the care of a physician at the time Robert Sentner's insurance was terminated.

Thus, Jason's inpatient treatment must be paid under the major medical expense provisions in the Plan unless the dependent deferral provision is valid and enforceable so as to bar coverage.

\*     \*     \*

### A.

■ A court must generally apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice or a statute or legislative history directs otherwise. *Bradley v. School Bd. of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Teamsters Pension Trust Fund of Philadelphia and Vicinity v. John Tinney Delivery Service, Inc.,* 732 F.2d 319, 323 (3d Cir.1984).

The case cited by Plaintiff, *Life Ins. Co. of No. America,* does not represent the present state of Pennsylvania law or public policy.[11] In that case, the Commonwealth

---

**10.** Prudential also suggests that the dependent deferral provision is conceptually different from a pre-existing condition exclusion. We do not agree. Any differences between the provision here in question and a pre-existing condition exclusion are not significant for purposes of applying the Pennsylvania regulations concerning pre-existing condition exclusions in group contracts.

**11.** The parties discuss Plaintiff's claim against Prudential and PAA in light of Pennsylvania law. No one suggests that the law of another state should apply in lieu of Pennsylvania law.

Court upheld the Insurance Commissioner's disapproval of two group policy forms containing a pre-existing condition exclusion. The court essentially held that the Commissioner has the statutory discretion to reject pre-existing condition clauses in the context of group policies.

■ A few months after the Commonwealth Court's decision, the Commissioner promulgated regulations which permit pre-existing condition exclusions in group insurance policies as long as the exclusions conform to the standards set forth therein. The regulations provide in relevant part:

§ 89.402. Approval.

(a) No preexisting condition limitation will be approved for use with a policy or contract which is more restrictive than the following definition: A preexisting condition is a disease or physical condition for which medical advice or treatment has been received within 90 days immediately prior to becoming covered under the group contract. Such condition shall be covered after the individual has been covered for more than 12 months under the group contract.

(b) Long-term disability benefit provisions may require that the total disability resulting from a preexisting condition commence after the individual has been covered for more than 12 months under the group contract.

§ 89.404. Pre-existing condition.

Any pre-existing condition limitation defined other than as set forth in § 89.-402 (relating to approval) must substantially conform to the standards set forth in this subchapter. Such pre-existing condition limitation would be considered for approval by the Department only

upon appropriate justification by the submitting company proposing to use it. 31 Pa.Code §§ 89.402 and 89.404.

Under Pennsylvania law, a regulation promulgated by an administrative agency does not have retroactive effect unless it is clearly intended to be so applied. *Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Pub. Welfare*, 68 Pa. Commw. 279, 449 A.2d 89 n. 3 (1982). Hence, administrative agencies may promulgate regulations that apply retroactively but their intent to do so must appear clearly and unequivocally on the face of the regulations. *Community Country Day School v. Commonwealth Dep't of Educ.*, 51 Pa.Commw. 286, 414 A.2d 428 n. 6 (1980).

■ In the instant case, the Pennsylvania regulations clearly express the nature and scope of their application. Specifically, the regulations provide:

§ 89.407. Effective date.

The provisions of this subchapter shall apply to all policies and agreements set forth in § 89.401 (relating to scope) issued, renewed, substantially altered, or amended, on or after November 23, 1979.

31 Pa.Code § 89.407.[12]

Thus, the Pennsylvania regulations in question apply to the PAA Plan if the group policies which form or underlie the Plan were "issued, renewed, substantially altered, or amended, on or after November 23, 1979." *See* 31 Pa.Code § 89.407.

Prudential and PAA have submitted to this Court copies of the alterations and amendments made from November 23, 1979 to the present with respect to the group policies here in question.[13] Their submissions reveal alterations and amendments so numerous and substantial as to leave no doubt that the PAA Plan comes within the purview of section 89.407, 31 Pa.Code § 89.407.[14] Therefore, the Penn-

---

**12.** The regulations in question also state in pertinent part that their provisions apply to all group accident and sickness policies "issued or issued for delivery in this Commonwealth." 31 Pa.Code § 89.401 ("Scope"). No one disputes that this provision encompasses the PAA Plan.

**13.** There is no contention that the Prudential group policies were issued or renewed on or after November 23, 1979. We note in this regard that the PAA Plan was inaugurated in 1947.

The dependent deferral provision was added by way of riders in 1960 and 1961.

**14.** The fact that most of the alterations and amendments were made specifically to policy no. GH–1700 does not change our conclusion. The materials submitted to the Court clearly show that the PAA Plan was "substantially altered, or amended, on or after November 23, 1979." *See* 31 Pa.Code § 89.407.

sylvania regulations in question should be applied to the PAA Plan.

■ We do not believe that manifest injustice results from the application of the Pennsylvania regulations to the PAA Plan because Prudential and PAA did not rely upon any well-established older rule permitting clauses such as the one in the PAA Plan when they rejected the Home's claim and defended against this lawsuit. Indeed, the only "older" rule which can be said to exist is that embodied by the decision in *Life Ins. Co. of No. America.*[15] Thus, the Pennsylvania regulations are presently the best expression of Pennsylvania public policy available to the courts.[16] The regulations, by their very terms, encompass the PAA Plan. Therefore, we believe that application of the Pennsylvania regulations to the PAA Plan is the most legally sound, reasonable and just course of action for this Court to follow.

\* \* \*

## B.

■ In applying the Pennsylvania regulations, we find that the dependent deferral provision in the PAA Plan is more restrictive than that permitted by the regulations. Specifically, the dependent deferral provision precludes coverage where the dependent, on the date the major medical insurance would otherwise become effective, is unable to carry on the regular and customary activities of a person in good health and of the same age and sex because of a bodily disorder or injury or a mental infirmity. The most restrictive clause permitted by the regulation would preclude cover-

age only if medical advice or treatment has been received for a disease or physical condition within 90 days immediately prior to the effective date of insurance. *See* 31 Pa.Code § 89.402(a).

The medical evidence of record indicates that Jason, as a result of his cerebral palsy, is and was totally disabled and will never be able to carry on the customary activities of a person in good health and of the same age and sex. Thus, under the clause permitted by the regulations, Jason could be covered despite his condition if he did not receive medical advice or treatment for the condition within 90 days immediately preceding the effective date of insurance. Under the clause in the PAA Plan, Jason would not be covered even if he received no such medical advice or treatment for 90 days or even if he received no medical treatment for a longer period of time. Indeed, Jason could never be covered under the dependent deferral provision because that clause provides that coverage will become effective on the last day of a 31-day period during which the dependent carried on the regular and customary activities of a person in good health and of the same age or sex and was at no time confined.[17] Again, the medical evidence indicates that Jason will never be able to carry on the regular and customary activities of a person in good health and of the same age and sex.

Moreover, the most restrictive clause permitted by the regulations must provide for coverage of the pre-existing condition after the individual is insured under the

**15.** The fact that the riders containing the provision in question were approved at their inception by the Insurance Department is not dispositive since, at that time, no statute, judicial decision or regulation set forth Pennsylvania public policy on this issue. Since that time, the Commonwealth Court decision and the Commissioner's regulations have issued, both of which indicate disapproval of the clause contained in the PAA Plan.

**16.** When the highest state court has not rendered an authoritative ruling on the issue under consideration, the task of a federal tribunal is to predict how that court would rule. *Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir.1984). In order to make the most

accurate prediction possible, the federal court must examine all relevant sources of pertinent state law and public policy. *See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 285 (3d Cir.1980). In applying the Pennsylvania regulations to the PAA Plan, we are essentially predicting that the highest court of Pennsylvania would apply the public policy embodied in the regulations to the PAA Plan in deciding whether the dependent deferral provision is valid and enforceable or not.

**17.** Coverage could also become effective at an earlier date if the insurance company has "satisfactory" evidence as to the "insurability" of the dependent.

group policy for more than 12 months. *See* 31 Pa.Code § 89.402(a).[18] Under the regulations, treatment for Jason's condition would therefore be covered after the insurance was in effect for one year. The dependent deferral provision in the PAA Plan makes no provision for future coverage. The lack of a provision for future coverage emphasizes that Jason could never be covered under the PAA Plan given the restrictive nature and language of the dependent deferral clause.

Since the dependent deferral provision is more restrictive than that permitted by Pennsylvania public policy, the provision may not be enforced. Therefore, it does not bar coverage for Jason's inpatient treatment from January to August 1981. PAA and Prudential, in a manner consistent with the contract between them, are thus liable for the amount of Jason's inpatient treatment subject to any deductible, if applicable,[19] and less the amount of Connecticut General's contribution, namely, $750.[20] In addition, Plaintiff is entitled to prejudgment interest, to be calculated from the date of its bill to PAA.

Accordingly, summary judgment is granted in favor of Plaintiff on its claims against Prudential and PAA.[21] Their corresponding cross-motions for summary judgment are denied.

\* \* \*

## II. CLAIM AGAINST CONNECTICUT GENERAL

Connecticut General relies upon the pre-existing condition provision in the Servico Policy as the basis for refusing to reimburse fully the Home for the expenses it incurred in connection with Jason's inpatient care and treatment. The provision in question states in relevant part:

> EXPENSES NOT COVERED. Covered Expenses will not include, and no payment will be made for expenses incurred
>
> . . .
>
> 5. for or in connection with an Injury or Sickness which is a Pre-existing Condition after benefits equal to $750 have become payable, unless those expenses are incurred after the expiration of (a) a 90–day period, ending while the Employee or Dependent is insured for Comprehensive Medical Benefits, during which he receives no treatment, incurs no expenses and receives no diagnosis from a Physician in connection with that Injury or Sickness or (b) a one year period during which such Employee or Dependent is continuously insured for Comprehensive Medical Benefits.
>
> PRE–EXISTING CONDITION. A Pre-existing Condition is an Injury or Sickness for which an Employee or a Dependent receives treatment, incurs expenses or receives a diagnosis from a Physician during the 90-day period immediately preceding the date such Employee or Dependent becomes insured for Comprehensive Medical Benefits. The term Pre-existing Condition will also include any condition which is related to any such Injury or Sickness.

Plaintiff contends that the provision in the Servico Policy is unenforceable under *Life Ins. Co. of No. America, supra.*

Alternatively, Plaintiff asserts that the provision is unenforceable because Mrs. Sentner, at the time she procured depend-

---

**18.** The inclusion of such a provision suggests an intent to promote and require coverage for pre-existing conditions in the context of group policies.

**19.** Plaintiff requests judgment in the amount of $54,654 which presumably reflects the cost of Jason's inpatient treatment at the Home. PAA contends, in a footnote in its brief, that Plaintiff's recovery, if any, is limited to $54,454 because of the "appropriate deductible and co-insurance" under the PAA Plan. *See* PAA's Brief at 4. We are unable to tell from this terse unsworn reference whether or not a deductible

is in fact applicable and if so, in what amount. The Court believes that this matter is certainly one which the parties can resolve among themselves.

**20.** The amount of Connecticut General's contribution is subtracted in order to prevent double recovery.

**21.** In light of this Court's decision on the applicability and effect of the Pennsylvania regulations on the dependent deferral clause, it is unnecessary to reach Plaintiff's contentions regarding waiver and estoppel.

ent coverage under the Servico Policy, did not receive notice of the pre-existing condition limitation in the manner required by a Pennsylvania regulation, 31 Pa.Code § 89.-403.

Plaintiff further argues in the alternative that Connecticut General is estopped from raising the pre-existing condition limitation as a defense because of representations allegedly made by Connecticut General to the Home indicating that Jason was covered and also because of the initial payment for Jason's inpatient treatment made by Connecticut General in April 1981.

Connecticut General contends that the pre-existing condition limitation in the Servico Policy is enforceable under applicable law. Specifically, Connecticut General contends that Tennessee law, rather than Pennsylvania law, applies and that under Tennessee law, the clause is valid and enforceable. Alternatively, Connecticut General argues that even if Pennsylvania law applies, the clause is also valid and enforceable under Pennsylvania law.

In response to Plaintiff's argument concerning notice, Connecticut General asserts that the Pennsylvania regulation in question, 31 Pa.Code § 89.403, does not apply to the Servico Policy. According to Connecticut General, any applicable disclosure requirements were fully satisfied.

Finally, Connecticut General maintains that, as a matter of law, it is not estopped from asserting the pre-existing condition limitation as a defense to Plaintiff's claim.

\* \* \* .

### A.

■ Where the district court's jurisdiction is predicated upon diversity of citizenship, the court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 562 n. 1 (3d Cir.1976).

■ Under traditional Pennsylvania law, an insurance contract is governed by the law of the state where the contract was made. *Jamison, supra; Nationwide Mut. Ins. Co. v. Walter*, 290 Pa.Super. 129, 138,

434 A.2d 164, 168 (1981). The place of making an insurance contract is the place of delivery. *Jamison, supra; Crawford v. Manhattan Life Ins. Co. of N.Y.*, 208 Pa. Super. 150, 154, 221 A.2d 877, 880 (1966). Pennsylvania courts have begun to discard traditional choice of law rules in favor of an "interest analysis" or "significant contacts" approach. *See Nationwide Mut. Ins. Co., supra; Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

■ In the case of *Henning v. Metropolitan Life Ins. Co.*, 546 F.Supp. 442 (M.D. Pa.1982), the court applied the "significant contacts" analysis to facts very similar to those before us. In *Henning*, General Electric had obtained a group insurance policy for its employees from Metropolitan Life Insurance Company. The group policy was applied for, signed, issued and delivered in New York. The policy had been filed with and approved by the New York State Insurance Department. Plaintiff's residence and a General Electric plant facility, one of many throughout the United States, were the only important contacts with Pennsylvania. The court held that New York law, rather than Pennsylvania law, should apply because New York, as the state where the policy was issued or delivered, had the greatest interest in having the policy interpreted according to its own state laws. The court reasoned that the significance of Pennsylvania's interest in protecting its resident-consumers from policy exclusions diminishes in the group policy context where the real insured is not the individual employee but rather, the entity or group of employees. In that situation, the employer, as representative of that entity, acts as the agent of the insured. *Id.* at 446. *See also Layman v. Continental Assurance Co.*, 416 Pa. 155, 205 A.2d 93 (1964).

We agree with the court's reasoning in *Henning* and hold that Tennessee law applies to the Servico Policy. The record shows that the Servico Policy was issued and delivered to Servico at its former corporate headquarters and principal office in Memphis, Tennessee in March 1977. It

was not issued or delivered to any location in Pennsylvania. The Policy was filed with and approved by the Tennessee Department of Insurance in April 1976. This group insurance policy covers employees of Servico facilities throughout the United States. Mrs. Sentner resides in Pennsylvania as does the Servico facility at which she works but we agree with the *Henning* Court that the importance of this contact lessens in the context of a group policy.

Thus, use of the "significant contacts" analysis militates in favor of Tennessee.[22] Indeed, application of the traditional approach also favors Tennessee law because the place of delivery, and hence the place of making, was Tennessee.

The language of the pertinent Pennsylvania statute and regulations confirms our view that Tennessee law, rather than Pennsylvania law, should apply to the Servico Policy. Specifically, the language of the relevant Pennsylvania statute suggests that the statutory provisions governing group insurance policies apply only to policies issued or delivered in Pennsylvania since it is only those policies which must be filed with and approved by the Pennsylvania Insurance Commissioner. *See* 40 PA. STAT.ANN. § 751 (Purdon Supp.1984).[23]

Likewise, the provisions of the Pennsylvania regulations discussed *infra* expressly apply only to group policies "issued or issued for delivery in this Commonwealth." 31 Pa.Code § 89.401. Neither the Pennsylvania statutes nor the regulations encompass the Servico Policy, thereby reinforcing our conclusion that Tennessee law should apply.

\* \* \*

**B.**

■ Upon applying Tennessee law, we find that the pre-existing condition clause in the Servico Policy is valid and enforceable. The policy containing the limitation was approved for use by the Tennessee Department of Insurance in March 1976. There have been no cases or other expressions of Tennessee public policy since that time indicating that the pre-existing condition limitation used by Connecticut General is now invalid or unacceptable. Furthermore, at least one Tennessee case has implicitly upheld the use of a pre-existing condition clause similar, at least in part, to the one in the Servico Policy. In *Norman v. Liberty Life Assurance Co.*, 556 S.W.2d 772 (Tenn.App.), *cert. denied* (Tenn.1977), the court affirmed the application of a pre-existing condition limitation in a group insurance policy to the plaintiff, thereby denying him coverage for a coronary bypass operation. The clause in that case was even more restrictive and less generous than the one in the instant case. Unlike the clause in the Servico Policy, the clause in *Norman* apparently made no provision for an allowance of $750 or for an allowance in any other amount. It also made no provision for future coverage.

Hence, we find no basis under Tennessee law for declining to enforce the pre-existing condition clause in the Servico Policy.

We note that the pre-existing condition limitation used by Connecticut General is acceptable even under Pennsylvania public policy. Thus, the content and scope of the clause in the Servico Policy substantially conform to the requirements of the Pennsylvania regulations.[24] Specifically, the

---

**22.** In January 1978, following the issuance of the Servico Policy, Servico moved its corporate headquarters and principal office to West Palm Beach, Florida. Changes and amendments to the Policy were sent to Servico at its new headquarters in Florida. We do not believe that Florida's contact with this matter is significant nor does Florida's interest in governing the Servico Policy outweigh that of Tennessee. In this regard, the Servico Policy has never been reissued. Furthermore, the pre-existing condition limitation was contained in the original policy when it was approved by the Tennessee Department of Insurance in 1976. The clause was not added by way of later amendment.

**23.** Another statutory section allows a group insurance policy to contain any provision permitted by the laws of another state when the policy is issued for delivery in that other state. *See* 40 PA.STAT.ANN. § 755(2) (Purdon 1971).

**24.** As discussed *infra*, we decline to apply the Commonwealth Court decision in *Life Ins. Co. of No. America* because we do not believe that the case represents current Pennsylvania public policy.

clause in the Servico Policy, like the regulations, essentially defines a pre-existing condition with reference to a 90-day period, immediately preceding the effective date of insurance, during which an individual receives treatment. As well, the clause in the Servico Policy, in accordance with the regulations, provides for coverage after the individual has been insured for one year. Indeed, the clause in the Servico Policy is more generous than that permitted by the Pennsylvania regulations because it provides benefits in an amount up to $750 even during the initial one year period. The regulations do not require such an allowance. Furthermore, the provision in the Servico Policy permits coverage to begin even before the expiration of one year if the insured individual receives no treatment for a period of 90 days. Again, the regulations impose no such requirement.

Therefore, the pre-existing condition limitation in the Servico Policy, as regards its content and scope, is valid and enforceable under the law and public policy of Pennsylvania, as well as that of Tennessee.[25]

\* \* \*

### C.

■ Plaintiff also contends that the clause is unenforceable because Mrs. Sentner did not receive proper notice of the pre-existing condition limitation at the time she procured dependent coverage under the Servico Policy. Plaintiff relies upon a Pennsylvania regulation, 31 Pa.Code § 89.403, for its argument.

The regulation in question provides:
§ 89.403. Disclosure.

(a) A disclosure statement substantially similar to the following shall be given in writing to a group member at the time of the enrollment under the group contract.

#### NOTICE

If you or any dependents have received medical care or advice within the past 90 days for a disease or physical condition, you, he or she will not be covered for

such disease or physical condition until you, he or she has been covered for one year under this contract. This exclusion, however, only applies to a disease or physical condition for which medical care or advice has been received in the past 90 days.

(b) The statement set forth in subsection (a) shall be printed in bold face type.
31 Pa.Code § 89.403.

Plaintiff's reliance on the regulation is misplaced because these regulations do not apply to the Servico Policy. As previously mentioned, the regulations apply to group insurance policies "issued or issued for delivery in this Commonwealth." 31 Pa.Code § 89.401. The Servico Policy was issued for delivery in Tennessee. Thus, the disclosure requirement set forth in the Pennsylvania regulation does not apply here.

In any event, Connecticut General has prepared an insurance certificate booklet which explains the features of the Servico Policy, including the pre-existing condition limitation. Upon the issuance of the group insurance policy to Servico, Connecticut General supplied several thousand insurance certificate booklets to Servico for distribution to employees who seek and obtain coverage under the Servico Policy. Since that time, Connecticut General has continued to reprint and supply copies of the booklet to Servico. It is Servico's normal practice to distribute these booklets to employees who seek coverage under the Servico Policy.

The record shows that Deborah Sentner did receive an insurance certificate booklet. According to her deposition testimony, she was told to read the booklet and determined that she "understood everything" and had no questions. *See* Deposition of Deborah Blaisdale at 83. Mrs. Sentner may also have been given a second booklet at the time she added dependent coverage to her insurance. *See id.* at 94.

Connecticut General's practice as well as the procedure followed in this particular

---

**25.** No one suggests that the clause is unenforceable under Florida law in the event that Florida

law and public policy were to apply.

case comport with general Pennsylvania law on the issue of disclosure.[26] *See, e.g.,* 40 PA.STAT.ANN. § 756.2(b)(2) (Purdon 1971) (every group accident and sickness policy shall contain a provision requiring the insurer to furnish to the policy holder, for delivery to each member of the insured group, an individual certificate setting forth, in summary form, a statement of the essential features of the policy). *See also Brezan v. Prudential Life Ins. Co. of America,* 507 F.Supp. 962, 966 (E.D.Pa. 1981) ("an insurer has no duty to inform an *employee* covered by group insurance directly; rather the insurer must provide a copy of the master policy to the *employer* who shoulders the responsibility for transmitting group insurance policy information to employees").[27]

Accordingly, we do not find the disclosure requirement set forth in the Pennsylvania regulations to be an appropriate basis for invalidating the pre-existing condition limitation in the Servico Policy.

\*     \*     \*

### D.

Finally, Plaintiff maintains that Connecticut General is estopped from raising the pre-existing condition limitation as a defense because of representations allegedly made by Connecticut General to Plaintiff and because Connecticut General made an initial payment for Jason's inpatient treatment.

Equitable estoppel is a doctrine designed to prevent one from doing an act differently from the way another was induced, by word or conduct, to expect. *Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 435, 457 A.2d 502, 503 (1983). The essential elements of equitable estoppel are inducement and justifiable reliance on that inducement. 500 Pa. at 436, 457 A.2d at 503.

More specifically, an estoppel arises when

"one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such acts."

*In re Estate of Tallarico,* 425 Pa. 280, 288, 228 A.2d 736, 741 (1967), quoting *Northwestern Nat'l Bank v. Commonwealth,* 345 Pa. 192, 196, 27 A.2d 20, 23 (1942). *See also Consolidated Rail Corp. v. Delaware and Hudson Ry.,* 569 F.Supp. 26, 29 (E.D. Pa.1983); *Schuylkill Prod., Inc. v. H. Rupert & Sons, Inc.,* 305 Pa.Super. 36, 43, 451 A.2d 229, 233 (1982).

The court in *Tallarico* continued as follows:

"(I)n the absence of expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites... There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise... Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in

---

**26.** No one contends that Connecticut General's practice or the procedure followed in this specific case fails to meet any disclosure requirements imposed by Tennessee or Florida law.

**27.** We note as well that the explanation set forth in the Connecticut General booklet substantially complies with the disclosure requirements of the Pennsylvania regulation.

his favor from his own omission or mistake... Estoppel cannot be predicated on errors of judgment by person asking its benefit."

425 Pa. at 288–89, 228 A.2d at 741, quoting 345 Pa. at 197, 27 A.2d at 23 (citations omitted).[28] *See also Consolidated Rail Corp., supra* at 29; *Schuylkill Prod., Inc.*, 305 Pa.Super. at 43, 451 A.2d at 233.

■ It is well established that the burden lies with the party asserting the *Novelty Knitting Mills, Inc.*, 500 Pa. at 436, 457 A.2d at 504. *See also Blofsen v. Cutaiar*, 460 Pa. 411, 417, 333 A.2d 841, 844 (1975); *Headman v. Berman Leasing Co.*, 352 F.Supp. 211, 214 (E.D.Pa.1972).

■ We hold that Plaintiff has failed to meet its burden of showing an estoppel in this case. Indeed, we find as a matter of law that Connecticut General is not estopped by its words or conduct from raising the pre-existing condition limitation in its policy as a defense to Plaintiff's claim.

In this regard, we find that the statements relied upon by Plaintiff, which were made by a representative of Connecticut General to a representative of the Home, do not constitute representations that any inpatient care for Jason's cerebral palsy would in fact be covered under the Servico Policy. In other words, any expectation by the Home that Jason's inpatient care for his cerebral palsy would be covered under the Servico Policy, based upon the December 1980 telephone conversation with a Connecticut General employee, would not be a reasonable or justified expectation.[29]

The facts pertinent to the alleged estoppel are as follows:

In October 1980, the Home's staff and administration discussed Jason's frequent absences from his outpatient program and his failure to make significant progress in the program. They further discussed the possibility of admitting Jason as an inpatient in order to facilitate his progress, depending upon whether there was space available for him in the appropriate unit, whether his mother would be agreeable to such an inpatient admission and depending upon the priorities in the Home's patient admissions. *See* Deposition of Anna Chorazy, M.D., at 34–36, 66–67. Sometime after this discussion but before January 8, 1981, the decision was made to admit Jason to the Home as an inpatient.

On or about December 18, 1980, Mrs. Janet Hoffman, an insurance supervisor with the Home, called Connecticut General to "check insurance" for Jason. *See* Deposition of Janet Hoffman at 23–24. She spoke with Mrs. Phyllis Phillips (formerly Ms. McConnell), a senior benefit analyst with Connecticut General. Mrs. Hoffman identified herself and stated that she was calling "regarding Jason Sentner, dependent of Deborah Sentner." *Id.* at 30. She requested "the benefits for inpatient hospitalization." *Id.* Mrs. Phillips, in response to Mrs. Hoffman's request, proceeded to recite the benefits available under the Servico Policy for inpatient hospitalization. *See id.* at 34–35. Mrs. Hoffman asked several additional questions, also relating to benefits, including, *inter alia*, the amount of the deductible for major medical and whether there was a "maximum." Mrs. Phillips answered these questions and their conversation then terminated. *See id.* at 35–36.[30]

Mrs. Hoffman completed a form, noting the benefits available under the Servico Policy. *See* Hoffman Deposition Exh. No.

---

**28.** We quote *Tallarico* at length only because numerous cases quote and cite to the language set forth above.

**29.** Plaintiff appears to rely only on the statements made during the December 1980 telephone conversation for its allegation of estoppel by words or representations. The record does not reveal any other time when statements or representations were made by Connecticut General to the Home in connection with the benefits or coverage available under the Servico Policy. Therefore, the Court will examine only the December 1980 telephone conversation in connection with this portion of Plaintiff's estoppel argument.

**30.** The Home did not seek written confirmation of any of the information provided by Connecticut General nor did the Home submit any written requests to Connecticut General for information regarding coverage for Jason's specific care and condition. *See id.* at 40–41.

2. She added the remark, "see no problem with her getting paid" at the bottom of the form. *See id.* In response to questioning at her deposition, Mrs. Hoffman stated that she made the notation at the bottom of the form based "on the benefits." Deposition of Janet Hoffman at 37. Mrs. Phillips never made such a remark. Rather, the words were entirely those of Mrs. Hoffman. *Id.* at 37, 58–59. Indeed, Mrs. Phillips never referred specifically to Jason or Deborah Sentner and never stated that coverage was available to Jason. *Id.* at 37–38.

To summarize Mrs. Hoffman's deposition testimony, Mrs. Phillips, at the request of Mrs. Hoffman, provided information concerning "the benefits." *Id.* at 40. Mrs. Phillips made no representations concerning Jason specifically and, in particular, made no representations that any inpatient care and treatment for Jason's cerebral palsy would be covered. The testimony discloses that Mrs. Hoffman never asked specific questions concerning coverage for the treatment of Jason's condition and never provided Mrs. Phillips with any information concerning Jason's care or condition which would have enabled Mrs. Phillips to reach any specific conclusions and make any representations regarding coverage for Jason's condition even assuming that she was authorized to do so.

Mrs. Phillips' deposition testimony corroborates that of Mrs. Hoffman. While she did not recollect the specific telephone conversation with Mrs. Hoffman on December 18, she testified that her general practice is to provide information concerning the benefits available under a policy or plan. *See* Deposition of Phyllis Phillips at

6–8. Mrs. Phillips' deposition indicates that she does not, in response to telephonic requests for information, "verify coverage" for the treatment of a particular individual's condition or illness. She simply provides information regarding the benefits under a given contract. *See id.* at 6–7 and 37–40.

We believe that the statements made by Mrs. Phillips in response to Mrs. Hoffman's questions do not create an estoppel against Connecticut General as a matter of law. Clearly, Connecticut General made no misrepresentations during the conversation in question. There is no evidence of any statements which could be considered misleading and certainly no evidence of fraudulent intent on the part of Connecticut General. Further, the failure to mention the pre-existing condition limitation does not constitute a concealment nor is it even tantamount to culpable negligence. In the particular conversation set forth above, the Home did not ask any questions or provide any information which would have elicited statements and representations from Connecticut General specifically directed at coverage for the treatment of Jason's cerebral palsy. Indeed, the record shows that the Home made no inquiries into coverage for the inpatient treatment of Jason's specific condition prior to admitting him as an inpatient. Thus, the Home made no preliminary inquiries which would have warranted a response noting the limitation for preexisting conditions. In the Court's view, the Home was obliged to make a more specific inquiry than it did if in fact it regarded insurance coverage as an important factor in deciding whether to admit Jason as an inpatient.[31] Accordingly, any

---

31. We also question whether the Home relied upon the presumed existence of insurance coverage when determining whether or not to admit Jason. The deposition testimony of Dr. Anna Chorazy shows that there were a number of factors which played a role in the decision to admit Jason as an inpatient. The tenor of her deposition suggests that the most significant factor was Jason's failure to progress satisfactorily under the outpatient program. *See* Deposition of Dr. Anna Chorazy at 34–36, 66–67. Therefore, assuming *arguendo* that Connecticut General's statements or silence did induce a reasonable expectation that Jason's inpatient treatment for his cerebral palsy would be covered under the Servico Policy, the evidence adduced during discovery is not clear and unequivocal that Jason's admission as an inpatient was the immediate and proximate result of the inducement or expectation. We do not believe that Connecticut General's representations or silence were sufficient, in and of themselves, to warrant the Home's action. In our view, the Home's action was the result of its own will or judgment rather than the product of what Connecticut General did or did not say with respect to Jason's insurance coverage.

expectation or assumption by the Home that Jason's inpatient treatment was covered under the Servico Policy was the result of the Home's own omission or mistake.

■ We also find, as a matter of law, that Connecticut General's April 1981 payment does not create an estoppel. The payment was made over three months after Jason's admission to the Home. Hence, Plaintiff could not have relied upon the payment in deciding whether or not to admit Jason as an inpatient. There is absolutely no evidence in the record which even suggests that the payment was an important factor in keeping Jason as an inpatient rather than discharging him. Indeed, the evidence which is in the record suggests that the existence or lack of insurance coverage did not play any role in the retention of Jason as an inpatient or in his discharge in August 1981. *See* Deposition of Dr. Anna Chorazy at 43–44, 76–78, 86–88. Moreover, Connecticut General quickly moved to correct its error by sending the Home a letter, about a month later, requesting a refund of its payment.

Thus, the April 1981 payment did not constitute an "inducement" to the Home nor did the Home justifiably rely upon the payment for any purpose.

Accordingly, Connecticut General is not estopped from raising and maintaining the pre-existing condition limitation as a defense to Plaintiff's claim. Plaintiff's motion for summary judgment against Connecticut General is therefore denied.

\* \* \*

### III. CONNECTICUT GENERAL'S COUNTERCLAIM

■ Connecticut General relies upon the pre-existing condition limitation as the basis for its counterclaim against Plaintiff. Specifically, Connecticut General contends

that it paid Plaintiff $4,772.43 beyond the amount it was required to pay under the terms of the Servico Policy, namely, $750.[32] It seeks to recover the overpayment under its counterclaim.

Under Pennsylvania law, an insurer may recover payments made to an insured under a mistake of fact or as a result of fraud or misrepresentation. *Foster v. Federal Reserve Bank of Philadelphia*, 113 F.2d 326, 327–28 (3d Cir.1940); *Van Riper v. Equitable Assurance Soc'y*, 561 F.Supp. 26, 33–34 (E.D.Pa.1982), *aff'd*, 707 F.2d 1397 (3d Cir.1983).[33]

■ The Pennsylvania Superior Court, in *Safran v. Mutual Life Ins. Co. of N.Y.*, 210 Pa.Super. 408, 234 A.2d 1 (1967), suggested that payments voluntarily made under an insurance contract cannot be recovered in the absence of fraud or misrepresentation. 210 Pa.Super. at 416, 234 A.2d at 5. This statement, however, was mere dictum since the court in that case had already decided that the insured was entitled to recover on the merits of his claim. Other courts have declined to follow the statement in *Safran*, noting that the statement in question was simply dictum. *See, e.g., Prudential Ins. Co. v. Nissley*, 65 D. & C. 2d 582 (C.P. Lancaster 1974).

We believe that *Foster, Van Riper* and *Nissley* represent the better view and that in most cases, an insurer should be entitled to recover payments previously made under a mistake of fact as well as payments made as a result of fraud or misrepresentation.

■ In the instant case, Connecticut General made the payment of $5,522.43 under a mistake of fact. It did not know at that time that the Home had treated Jason for his cerebal palsy within the 90-day peri-

---

**32.** This Court has already held that the pre-existing condition limitation in the Servico Policy is valid and enforceable and that Connecticut General is not estopped from raising and maintaining the limitation as a defense to Plaintiff's claim. As well, with respect to Connecticut General's counterclaim, the clause is valid and enforceable under the reasoning set forth *infra* and Connecticut General is not estopped from asserting the limitation as the basis for its coun-

terclaim. Thus, under the terms of the Servico Policy, the amount for which Connecticut General is liable, and which it has already paid, is $750.

**33.** Both Plaintiff and Connecticut General cite Pennsylvania cases on this issue. Since neither proffers cases from other jurisdictions or argues that the law of another state should apply, we shall follow Pennsylvania law on this question.

od immediately preceding the effective date of his insurance. Connecticut General did not acquire full knowledge of the facts until after it made this initial payment. As previously noted, Connecticut General then moved quickly to rectify the overpayment.

Therefore, we believe that Connecticut General is entitled to recover its overpayment in the amount of $4,772.43. Accordingly, Connecticut General's motion for summary judgment on its counterclaim is granted.

\* \* \*

### IV. PRUDENTIAL AND PAA'S CROSS–CLAIM

■ Connecticut General has moved to dismiss the cross-claim filed by Prudential and PAA pursuant to Fed.R.Civ.P. 12(b)(6), alleging that Prudential and PAA have failed to state a claim for which relief can be granted. Specifically, Connecticut General contends that there is no basis under Pennsylvania law for contribution among separate co-insurers. As well, there is no contractual understanding between Connecticut General and the other two Defendants with respect to contribution.

Our disposition of Plaintiff's claims against Defendants on the merits effectively resolves the cross-claim and Connecticut General's motion to dismiss. In this regard, Connecticut General is only liable under its policy for $750, which it has already paid. Prudential and PAA are liable for the full amount. The $750 paid by Connecticut General, however, has been subtracted from the amount due and owing from Prudential and PAA in order to prevent double recovery as to the former amount. Thus, the Connecticut General policy effectively covers only a portion of the liability. "Double insurance" does not exist as to the remainder of the liability. Therefore, Prudential and PAA cannot claim contribution from Connecticut General as to the latter amount.[34] *See Southern Surety Co. v. Commercial Cas. Ins. Co.,* 31 F.2d 817 (3d Cir.), *cert. denied,* 280 U.S.

577, 50 S.Ct. 31, 74 L.Ed. 628 (1929); *Meigs v. Insurance Co. of No. America,* 205 Pa. 378, 54 A. 1053 (1903).

Since Connecticut General has already contributed the amount for which it is liable and that amount has been subtracted from the full amount for which Prudential and PAA are liable and also since there is no basis for requiring Connecticut General to contribute to the amount representing the remainder of the liability, Connecticut General's motion to dismiss the cross-claim is granted.

\* \* \*

### V. ATTORNEY'S FEES

■ Plaintiff seeks an award of attorney's fees against those parties over which it has prevailed. Since Plaintiff did not prevail over Connecticut General, Plaintiff can only recover attorney's fees, if at all, against Prudential and PAA. We shall therefore discuss this issue only as it pertains to the latter two Defendants.

Attorney's fees are not ordinarily awarded by a federal court absent specific statutory or contractual authorization. *See Alyeska Pipeline Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). An exception lies when the losing party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons....' " *Id.* at 258–59, 95 S.Ct. at 1622, quoting *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). In such cases, attorney's fees may be awarded to the prevailing party even where there is no statutory or contractual authority.

■ Plaintiff contends that ERISA authorizes an award of attorney's fees against Prudential and PAA. Plaintiff, however, did not bring its claim against Prudential under ERISA. Rather, the action against Prudential was predicated solely upon this Court's diversity jurisdiction.

---

**34.** As well, there is no legal basis for Prudential and PAA's claim of indemnification against Connecticut General as to this amount.

Indeed, relevant case law indicates that Plaintiff could not have stated a claim against Prudential or Connecticut General under ERISA, based upon the facts presented here. *See, e.g., Lederman v. Pacific Mut. Life Ins. Co.,* 494 F.Supp. 1020 (C.D.Cal.1980) (ERISA does not govern a claim against an insurance company by a participant in an employer's group health insurance plan); *Cate v. Blue Cross & Blue Shield of Alabama,* 434 F.Supp. 1187 (E.D.Tenn.1977) (an action by an employee against an insurer under the employer's group health insurance plan fails to state a claim under ERISA). Hence, Plaintiff can only recover attorney's fees against Prudential if Prudential acted vexatiously or in bad faith.[35]

There is absolutely no evidence that Prudential acted in bad faith or for improper reasons or in a manner which was oppressive or otherwise inappropriate. Accordingly, Plaintiff may not obtain an award of attorney's fees against Prudential.

■ With respect to PAA, section 502(g)(1) of ERISA permits a court, in its discretion, to award a reasonable attorney's fee and costs to either party. 29 U.S.C. § 1132(g)(1) (Supp.1984).[36] An award of attorney's fees to a prevailing party is not mandatory under this provision. *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983).

■ There are five policy factors that the courts consider when determining whether or not to award attorney's fees under section 502(g)(1):

(1) the offending party's bad faith or culpability,

(2) the ability of the offending party to pay the fee award,

(3) the deterrent effect of an attorney's fee award against others acting under similar circumstances,

(4) whether or not the party requesting attorney's fees seeks to benefit all participants or members of the ERISA plan, and

(5) the relative merits of the parties' positions.

719 F.2d at 673; *Kann v. Keystone Resources, Inc.,* 575 F.Supp. 1084, 1096 (W.D. Pa.1983). *See also Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 602 n. 9 (2d Cir.), *cert. denied,* ── U.S. ──, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 453 (9th Cir. 1980); *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980); *Eaves v. Penn,* 587 F.2d 453, 465 (10th Cir.1978).

A weighing of the five factors militates against an award of attorney's fees in this case. It appears that only one factor, PAA's ability to pay the fee award, is met here. There is no evidence of bad faith or culpability on the part of PAA. As well, while unsuccessful in this litigation, PAA had a defense that was reasonable and not frivolous. Furthermore, an award of attorney's fees would have little or no deterrent value here. Finally, Plaintiff did not bring this action to benefit the participants and members of the PAA Plan and it is unlikely that the plan members, as a whole, will in fact benefit to any significant extent, if at all, from this action.

Accordingly, Plaintiff's request for attorney's fees is denied as against PAA as well as against the other Defendants.

An appropriate Order follows.

### ORDER

And now, this 27th day of June, 1984, Plaintiff's motions for summary judgment

---

**35.** Plaintiff has not suggested any contractual authorization for an award of attorney's fees against Prudential.

**36.** No one contends that section 502(g)(2), 29 U.S.C. § 1132(g)(2), applies. That subsection requires an award of attorney's fees to an employee benefit plan which prevails in an action by a fiduciary for or on behalf of the plan to collect delinquent contributions from an employer. This provision clearly does not apply here.

against Defendants Prudential and PAA are hereby GRANTED; the cross-motions for summary judgment filed by Prudential and PAA are hereby DENIED. Plaintiff's motion for summary judgment against Defendant Connecticut General is hereby DENIED. The motion filed by Connecticut General for summary judgment on its counterclaim is hereby GRANTED. Connecticut General's motion to dismiss the cross-claim filed by Prudential and PAA is also hereby GRANTED.

Judgment is hereby entered in favor of Plaintiff and against Prudential and PAA in the amount of $53,904.00 subject to any deductible, if applicable, plus prejudgment interest. Judgment is hereby entered in favor of Connecticut General and against Plaintiff in the amount of $4,772.43.

Plaintiff's request for attorney's fees is hereby DENIED.